10-03-2099

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL RENO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 10 cv 06114 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge St. Eve |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' JOINT RULE 56.1 STATEMENT OF UNCONTESTED FACTS**

NOW COME the Defendants, CITY OF CHICAGO, CHICAGO POLICE OFFICERS KEITH HARRIS, Star No. 19542 (hereinafter "HARRIS"), JEROME HOFFMAN, Star No. 19110 (hereinafter "HOFFMAN"), KHALED SHAAR, Star No. 9039 (hereinafter "SHAAR"), and NELSON GONZALEZ, Star No. 7235 (hereinafter "GONZALEZ"), by and through their attorneys, CUISINIER, FARAHVAR & BENSON, LTD., and for their Local Rule 56.1 Statement of Uncontested Facts, hereby state as follows:

## I. PROCEDURAL HISTORY

1. On September 23, 2010, Plaintiff filed his Complaint against Defendants in the United States District Court for the Northern District of Illinois, Eastern Division. (See Complaint, a copy of which is attached hereto as Exhibit "A.") A First Amended Complaint was filed March 30, 2011. (See First Amended Complaint, a copy of which is attached hereto as Exhibit "B".)

2. Plaintiff alleges that HARRIS, HOFFMAN, SHAAR, and GONZALEZ did not have a lawful basis to arrest Plaintiff on March 28, 2009 and is liable under § 1983. (Exhibit

"A"; Exhibit "B".) Plaintiff also alleges the Defendants maliciously prosecuted him in violation of state law. (Exhibit "A"; Exhibit "B".)

3. Defendants have denied all material allegations made in Plaintiff's Complaint. (See Defendant, City of Chicago's Answer to Plaintiff's Complaint, Defendant Harris's Answer to Plaintiff's Complaint, Defendant Hoffman's Answer to Plaintiff's Complaint, Defendant Shaar's Answer to Plaintiff's Complaint, and Defendant Gonzalez's Answer to Plaintiff's Complaint, copies of which are attached hereto as Group Exhibit "C".)

4. Defendants now bring their Motion for Summary Judgment as to Plaintiff's Complaint as a whole.

5. This matter is not currently scheduled for trial.

6. Discovery was closed by this Honorable Court before this Motion was filed.

## II. INCIDENT OF MARCH 28, 2009

7. Plaintiff was arrested on March 28, 2009 in the vicinity of the intersection of 79th Street and Essex around 5:00 p.m. (See Deposition of Michael Reno, a copy of which is attached hereto as Exhibit "D", at 11-12; see also deposition of Keith Harris, a copy of which is attached hereto as Exhibit "E", at 34; see also deposition of Jerome Hoffman, a copy of which is attached hereto as Exhibit "F" at 21.)

8. RENO went to 79th Street that day from his friend's house, where he had stayed the night before. (Exhibit "D" at 16-17.)

9. RENO left his friend's house between 3:00 p.m. and 3:30 p.m. (Exhibit "D" at 17.)

10. It took RENO about 20 minutes to get from his friend's house to 79th and Essex. (Exhibit "D" at 17.)

11. HARRIS, HOFFMAN, SHAAR, and GONZALEZ were police officers assigned to the Narcotics Division of the Chicago Police Department on March 28, 2009. (See Deposition of Nelson Gonzalez, a copy of which is attached hereto as Exhibit "G", at 6, 9.)

12. HARRIS and GONZALEZ were members of Team B-5 of Unit 189. (Exhibit "E" at 13, 31; Exhibit "G" at 11; see also deposition of Khaled Shaar, as Exhibit "H" at 17.) Sgt. Darwin Butler was the sergeant of Team B-5. (Exhibit "E" at 15; Exhibit "G" at 16; Exhibit "H" at 17; see also deposition of Darwin Butler, as Exhibit "I", at 6.) HOFFMAN was a member of Team B-2 of Unit 189. (Exhibit "F" at 18.) SHAAR was a member of Team B-3 of Unit 189. (Exhibit "H" at 11.)

13. The defendant officers, along with several other officers, were working together as part of a Surgical Strike Mission on March 28, 2009. (Exhibit "E" at 17; Exhibit "G" at 12; Exhibit "H" at 7, 36-37.)

14. Defendant officers, along with other team members, located to the area of 79th Street and Essex on March 28, 2009 as part of the Surgical Strike Mission. (Exhibit "F" at 25; Exhibit "G" at 17; Exhibit "I" at 10.) The Surgical Strike Mission includes the set up of "controlled buys" using an undercover officer. (Exhibit "F" at 9-10; Exhibit "H" at 7-8; Exhibit "I" at 8.)

15. GONZALEZ served as a surveillance officer in the area of 79th and Essex on March 28, 2009. (Exhibit "E" at 25-26; Exhibit "G" at 18-19, 22; Exhibit "I" at 9.) The surveillance officer watches the undercover officer, known as the "buy officer", for safety reasons and to document what is taking place. (Exhibit "E" at 42-43.)

16. HARRIS was the "buy officer", who is the undercover officer who purchased narcotics from RENO. (Exhibit "E" at 23, 26; Exhibit "I" at 9.)

17. HARRIS used “1505 funds” for the “controlled buy” with RENO. (Exhibit “E” at 19; Exhibit “I” at 8.) “1505 funds” are U.S. currency, the serial numbers of which have been prerecorded by the Chicago Police Department. (Exhibit “E” at 19; Exhibit “F” at 13; Exhibit “H” at 12; Exhibit “I” at 8.) “1505 funds” are used to assist the officers in locating an offender to see if the offender has the funds on him at the time of the arrest. (Exhibit “E” at 21.)

18. Surveillance officers can be “buy officers” and vice versa. (Exhibit “G” at 33.) Surveillance officers and buy officers are in covert vehicles and do not look like the police. (Exhibit “G” at 33.) Enforcement officers are very visible. (Exhibit “G” at 33.) They look like the police. (Exhibit “G” at 33.) Enforcement officers have to drive an “M” plate car, they have vests on, and they have their guns exposed. (Exhibit “G” at 33; Exhibit “H” at 17.)

19. HOFFMAN and SHAAR served as enforcement officers. (Exhibit “E” at 26; Exhibit “F” at 12; Exhibit “G” at 20-21; Exhibit “H” at 15; Exhibit “I” at 10.) Enforcement officers are there for safety in case something goes wrong and also to detain a person after a buy is made. (Exhibit “E” at 43.)

20. Sgt. Butler served as the supervisor of the Surgical Strike Mission on March 28, 2009 and also acted as a surveillance officer. (Exhibit “I” at 6, 8.)

21. As part of the Surgical Strike Mission, the team was to spread out in the area to look for possible targets selling narcotics. (Exhibit “G” at 22.) The team members were in communication through their Nextel phones. (Exhibit “E” at 27; Exhibit “F” at 26; Exhibit “H” at 16; Exhibit “I” at 16.) These Nextel phones are only for radio communication. (Exhibit “E” at 27.) The Nextel phones do not have phone numbers. (Exhibit “E” at 27.)

22. GONZALEZ, who was in a covert, unmarked vehicle by himself, went to the area of 79th Street and Essex where he observed RENO conducting what appeared to be narcotic-related hand-to-hand transactions with passers-by. (Exhibit "G" at 22-23.)

23. While he was at the area of 79th Street and Essex, GONZALEZ saw RENO dressed in a black skull cap, black hooded jacket, and black jeans with orange trim walking east and west on the north side of the intersection of 79th Street and Essex and walking north and south on the west side of the intersection of 79th Street and Essex. (Exhibit "E" at 47; Exhibit "G" at 24.) On a few occasions, GONZALEZ saw RENO stop to have conversations with people. (Exhibit "E" at 46-47; Exhibit "G" at 24.)

24. GONZALEZ saw RENO engage in what appeared to be hand-to-hand transactions a couple of times at the northwest corner of the intersection of 79th Street and Essex. (Exhibit "G" at 25.) By hand-to-hand transaction, GONZALEZ means that during his conversations with passers-by, RENO would appear to give items and accept items by hand. (Exhibit "G" at 24.) GONZALEZ did not know what was being exchanged. (Exhibit "G" at 24.)

25. The hand-to-hand transactions consisted of RENO giving something and accepting something with the other individual doing the same thing. (Exhibit "G" at 27-28.) GONZALEZ could not see what was being exchanged. (Exhibit "G" at 27, 35.) GONZALEZ could not hear RENO saying anything. (Exhibit "G" at 31.)

26. After each transaction, RENO would go into one of the stores at the corner of 79th Street and Essex. RENO would go into the ABC Cellular store at the northwest corner of the intersection. (Exhibit "G" at 28.) There was also another store at the northeast corner that RENO went into and also a location at the southwest corner. (Exhibit "G" at 28-29.) RENO

spent a lot of time basically walking east and west on the north side and north and south on the west side and going into these locations every so often. (Exhibit “G” at 29.)

27. After the first hand-to-hand transaction he saw, GONZALEZ radioed to his team advising that there may be a possible narcotics transaction. (Exhibit “G” at 36; Exhibit “I” at 11.) GONZALEZ then repositioned himself to have a better surveillance point. (Exhibit “G” at 27, 36.) He repositioned to a parking lot at the southeast corner of the intersection. (Exhibit “G” at 36.) GONZALEZ’s vehicle was facing in a northerly direction right up against a fence or gate. (Exhibit “G” at 37.)

28. After the second hand-to-hand transaction he saw, GONZALEZ radioed to other officers on his team that he believed there was some kind of narcotic-related activity going on involving RENO. (Exhibit “G” at 29, 31; Exhibit “I” at 12.) GONZALEZ wanted to send an undercover officer to ask for drugs and see if it would work. (Exhibit “G” at 29.)

29. GONZALEZ gave a location and description of the individual at that particular intersection who might be selling drugs, who was later learned to be RENO. (Exhibit “E” at 47; Exhibit “G” at 29, 32.) GONZALEZ gave his fellow officers a physical description of RENO as well as a description of RENO’s clothing. (Exhibit “E” at 47; Exhibit “F” at 28; Exhibit “G” at 29, 39.)

30. GONZALEZ gave a description of an African-American male wearing a black skullcap, black either jacket or hooded sweatshirt, some black pants with some distinctive orange stitching. (Exhibit “E” at 47.)

31. Upon notice from GONZALEZ of possible narcotic-related activity in the area, Sgt. Butler set up surveillance on Essex, just south of 79th Street. (Exhibit “I” at 12.) Sgt.

Butler was in plain clothes in a covert vehicle, which is a vehicle without an "M" plate. (Exhibit "I" at 15.)

32. While at the scene, Sgt. Butler saw a male black, dark complexion, wearing a black jacket or hoodie, dark jeans with orange trimming engaging in what appeared to be hand-to-hand transactions. (Exhibit "I" at 17.)

33. HOFFMAN and SHAAR relocated to the area near the intersection of 79th Street and Essex. (Exhibit "F" at 26.) HOFFMAN and SHAAR were within 2-4 blocks of the intersection so as not be seen. (Exhibit "F" at 26; Exhibit "H" at 16.) HOFFMAN was not able to see the intersection of 79th Street and Essex. (Exhibit "F" at 26.) When HOFFMAN and SHAAR arrive in the area, they continue to monitor the radio. (Exhibit "F" at 27-28.)

34. An undercover officer was sent in to target the individuals standing on the corner who appeared to be making hand-to-hand narcotic transactions. (Exhibit "I" at 24.)

35. HARRIS came on the radio and said that he was not too far away and that he would do the undercover buy. (Exhibit "E" at 47; Exhibit "G" at 34.)

36. GONZALEZ saw HARRIS come to the intersection. (Exhibit "G" at 37, 39.) HARRIS came to the area less than 10 minutes after GONZALEZ saw the second hand-to-hand transaction. (Exhibit "G" at 38.) HARRIS came to the area between 5-10 minutes after he was instructed to try to make a buy. (Exhibit "I" at 24.)

37. HARRIS parked his vehicle, which was also a covert vehicle, on the east side of Essex, just south of 79th Street. (Exhibit "E" at 48, 50; Exhibit "G" at 39.) Once HARRIS got out of his vehicle, he shut down his radio. (Exhibit "E" at 48.)

38. When HARRIS got out of his vehicle, he observed the subject GONZALEZ described. (Exhibit "E" at 49.) The subject was a male black wearing a black skullcap, black

shirt or coat, and the black jeans. (Exhibit "E" at 49.) HARRIS then walked north and crossed over to the west side of the street. (Exhibit "E" at 49; Exhibit "G" at 39.)

39. When HARRIS got to the southwest corner of the intersection of 79th Street and Essex, HARRIS proceeded to walk north toward RENO. (Exhibit "G" at 39.) RENO was just standing around on the northwest corner of the intersection. (Exhibit "E" at 49, 51.) HARRIS then had a short conversation with RENO. (Exhibit "G" at 39; Exhibit "I" at 27.)

40. HARRIS approached RENO and asked him if he had any "rocks", which is street slang for cocaine. (Exhibit "E" at 52.) RENO told HARRIS to follow him. (Exhibit "E" at 52.) RENO then turned and walked south on the west side of the intersection toward the southwest corner. (Exhibit "E" at 53; Exhibit "G" at 40.) HARRIS was following closely behind RENO. (Exhibit "G" at 40.) When they go to the southwest corner of the intersection, RENO turned and spoke to HARRIS. (Exhibit "G" at 40.)

41. RENO asked HARRIS how many he wanted and HARRIS told RENO one. (Exhibit "E" at 54.) RENO then told HARRIS to give him the money. (Exhibit "E" at 54.)

42. HARRIS then tendered RENO money. (Exhibit "G" at 40.) HARRIS used "1505 funds" during the transaction. (Exhibit "E" at 54-55; Exhibit "H" at 13.) HARRIS gave RENO $10 USC, consisting of two $5 bills. (Exhibit "E" at 55.)

43. RENO took the money and went into what looked like a store at the southwest corner. (Exhibit "E" at 56; Exhibit "G" at 40.) HARRIS waited outside. (Exhibit "E" at 56, 58.) During this transaction, GONZALEZ is directly east of HARRIS and RENO. (Exhibit "G" at 41.)

44. After a short period of time, RENO came back outside and had another hand-to-hand transaction with HARRIS. (Exhibit "G" at 42; Exhibit "I" at 28-29.)

45. When RENO came back outside, RENO handed HARRIS one small plastic knotted item. (Exhibit "E" at 58-59.) HARRIS took whatever object RENO gave to him and began to walk south back toward his vehicle. (Exhibit "E" at 59-61; Exhibit "G" at 43.) RENO then turned and went back into the building at the southwest corner. (Exhibit "G" at 43.)

46. While GONZALEZ was observing HARRIS and RENO engage in a hand-to-hand transaction, GONZALEZ was on his radio describing what he was observing. (Exhibit "F" at 60; Exhibit "G" at 46; Exhibit "H" at 18.)

47. Once RENO was inside the building, he was out of GONZALEZ's view. (Exhibit "G" at 45; Exhibit "H" at 21.)

48. When HARRIS returned to his vehicle, HARRIS left the immediate area and got on his radio to tell his team members what happened. (Exhibit "E" at 61-62; Exhibit "I" at 29.) HARRIS said he had a "positive transaction" with the individual and gave a description of RENO as well as the location of where he last saw RENO. (Exhibit "E" at 62; Exhibit "F" at 29-31, 49, 60; Exhibit "G" at 48; Exhibit "I" at 30.) HARRIS also gave the last known location where RENO was at and described the transaction. (Exhibit "E" at 62; Exhibit "F" at 30; Exhibit "G" at 48.) HARRIS also said over the radio that he used "1505 funds" during the transaction and gave RENO two $5 bills. (Exhibit "E" at 62; Exhibit "F" at 31.)

49. The individual was described as a male black, black clothing, black pants with orange piping or design. (Exhibit "F" at 31; Exhibit "I" at 30.)

50. Sgt. Butler instructed the enforcement officers on when to come to the scene to detain RENO. (Exhibit "E" at 64; Exhibit "G" at 46-47; Exhibit "H" at 16; Exhibit "I" at 31.)

51. HOFFMAN and SHAAR, the enforcement officers, arrived on the scene within 10-15 minutes. (Exhibit "E" at 64; Exhibit "F" at 59; Exhibit "G" at 49; Exhibit "I" at 32.) Enforcement officers are not sent in immediately because apprehending an offender of a narcotics transaction involving an undercover officer too quickly can sometimes give away the undercover status of the officer. (Exhibit "G" at 49.)

52. GONZALEZ did not see RENO again before the enforcement officers arrived on the scene. (Exhibit "G" at 49-50.) GONZALEZ did not see RENO exit the building before the enforcement officers arrived. (Exhibit "G" at 50.)

53. HOFFMAN and SHAAR relocated to the intersection of 79th Street and Essex. (Exhibit "F" at 32.)

54. When SHAAR and HOFFMAN, the enforcement officers, arrived on the scene, they parked on the south side of 79th Street, just west of Essex. (Exhibit "G" at 50.)

55. After exiting their vehicle, SHAAR and HOFFMAN went into the store on the southwest corner. (Exhibit "F" at 33-34; Exhibit "G" at 51; Exhibit "H" at 23.) It is unclear what kind of store RENO went into. (Exhibit "E" at 56.) HOFFMAN and SHAAR do not know what kind of store it was that they went inside. (Exhibit "F" at 33; Exhibit "H" at 24.) It was not a convenience store and it did not have shelves or a lot of items. (Exhibit "F" at 33.) It was basically counters and a register. (Exhibit "H" at 24.)

56. There were three people in the store when HOFFMAN and SHAAR went inside. (Exhibit "F" at 34-35; Exhibit "H" at 25.) There were two individuals behind the counter. (Exhibit "F" at 34.) HOFFMAN also saw an individual at the counter that matched the description he was given by GONZALEZ and HARRIS. (Exhibit "F" at 34-35.)

57. RENO was standing at the counter when the police officers approached him. (Exhibit "D" at 17.) RENO had been in the store about five minutes before the police officers approached him. (Exhibit "D" at 12.)

58. When he walked into the store, HOFFMAN looked around the store and approached the individual. (Exhibit "F" at 35-36.)

59. HOFFMAN identified himself by exposing his badge. (Exhibit "F" at 36.) RENO was asked for his name and information like that. (Exhibit "F" at 36.) RENO was cooperative. (Exhibit "F" at 36-37.)

60. HOFFMAN looked around in RENO's immediate area. (Exhibit "F" at 37.)

61. HOFFMAN and SHAAR exited the store with RENO after 2-3 minutes. (Exhibit "F" at 37, 39; Exhibit "G" at 51-52.) They asked RENO to follow them outside of the store. (Exhibit "F" at 37.)

62. RENO was taken outside to have the undercover buy officer identify him as being the same person with whom he conducted the narcotics transaction. (Exhibit "H" at 27; Exhibit "I" at 33.) Once the enforcement officers have a suspect in custody, HARRIS will drive past the location to positively identify the suspect as the person that sold narcotics. (Exhibit "E" at 64, 66-67; Exhibit "I" at 33.)

63. HOFFMAN and SHAAR did not tell RENO why they were asking him to exit the store. (Exhibit "F" at 37-38.)

64. RENO did not admit to any criminal activity. (Exhibit "F" at 40, 50; Exhibit "H" at 45.)

65. HOFFMAN and SHAAR then talked with RENO until they received a positive identification from HARRIS. (Exhibit "F" at 39-41.)

66. After RENO was detained by HOFFMAN and SHAAR, a pat down was performed for weapons. (Exhibit "H" at 26.)

67. HARRIS identified RENO as the individual who sold him the narcotics over the radio. (Exhibit "E" at 68-69; Exhibit "H" at 28-29.) HARRIS drove by heading westbound on 79th Street, slowed down by the scene, and as he continued westbound was on the radio explaining to the enforcement officers that they had the right guy. (Exhibit "G" at 52-53.)

68. Shortly after HARRIS makes the identification, RENO was taken into custody and a custodial search was performed. (Exhibit "F" at 41-42; Exhibit "H" at 27, 29.) The custodial search is a more thorough search than the original pat down. (Exhibit "H" at 29.)

69. The police officers took RENO outside, went into his pockets and took out his money. (Exhibit "D" at 20.) One officer went to the trunk of the car, opened the trunk and brought out a clipboard. (Exhibit "D" at 20.) The officer looked at the clipboard and looked at RENO's money. (Exhibit "D" at 20.)

70. During the search, SHAAR did find money on RENO, but the serial numbers on the money RENO had in his possession did not match anything on the log of "1505 funds". (Exhibit "H" at 30.)

71. The officers put the money back in RENO's pocket. (Exhibit "D" at 20.)

72. When he discovered that the money RENO had did not match the log of "1505 funds", SHAAR went back into the store and spoke with the woman behind the counter. (Exhibit "H" at 28, 31.) SHAAR asked the woman if RENO had given her any money or exchanged any money. (Exhibit "H" at 31.) SHAAR also performed a cursory search of the premises to see if he could possibly find where RENO had hidden the money or drugs in the store. (Exhibit "H" at 31.) SHAAR did not have anything in the store. (Exhibit "H" at 31.)

73. SHAAR and HOFFMAN put RENO into the back of their car. (Exhibit "D" at 20; Exhibit "F" at 50; Exhibit "G" at 53.)

74. RENO was transported to Area 2 for processing. (Exhibit "E" at 70; Exhibit "F" at 50; Exhibit "H" at 32, 35.) RENO was transported to the station by HOFFMAN and SHAAR. (Exhibit "F" at 50.)

75. When they arrived at Area 2, RENO was secured in an interview room on the second floor. (Exhibit "F" at 51.)

76. "1505 funds" were not recovered. (Exhibit "E" at 71, 87; Exhibit "F" at 42; Exhibit "G" at 55; Exhibit "I" at 33, 36.)

77. It is not unusual that the "1505 funds" were not recovered. (Exhibit "F" at 59; Exhibit "G" at 55-56.)

78. HOFFMAN inventoried the narcotics, which he retrieved from HARRIS. (Exhibit "E" at 72, 75; Exhibit "F" at 51, 53.) HARRIS gave HOFFMAN one clear plastic knotted bag containing suspect crack cocaine. (Exhibit "E" at 73; Exhibit "F" at 51.)

79. Narcotics were not recovered from RENO. (Exhibit "F" at 44; Exhibit "G" at 57.)

80. RENO denies selling drugs to anyone on the date of his arrest. (Exhibit "D" at 28.)

Respectfully Submitted,

CUISINIER, FARAHVAR & BENSON, LTD.

/s/ Victoria R. Benson
Victoria R. Benson, one of the attorneys for Defendants

Francis P. Cuisinier
Paul A. Farahvar
Victoria R. Benson
CUISINIER, FARAHVAR & BENSON, LTD.
200 W. Adams Street, Suite 430
Chicago, Illinois 60606
(312) 634-0412