Reno vs. City of Chicago

10 CV 6114

Deposition of: Officer Keith Harris

Taken on: August 03, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL RENO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 10 CV 06114 |
| | ) | |
| City of Chicago Police Officer | ) | |
| KEITH HARRIS, Star #19542, | ) | |
| City of Chicago Police Officer | ) | |
| JEROME HOFFMAN, Star #19110, | ) | |
| City of Chicago Police Officer | ) | |
| SHAAR, City of Chicago Police | ) | |
| Officer NELSON GONZALEZ, Star | ) | |
| #7235, and the CITY OF | ) | |
| CHICAGO, | ) | |
| Defendants. | ) | |

The deposition of OFFICER KEITH HARRIS, called by the Plaintiff for examination, taken pursuant to notice and by the provisions of the Rules of Civil Procedure for the United States

District Courts pertaining to the taking of depositions, taken before June M. Funkhouser, CSR No. 084-003024, RMR, a Notary Public within and for the County of Kane, State of Illinois, and a Certified Shorthand Reporter of said State, at the offices of Ed Fox & Associates, 300 West Adams Street, Suite 330, Chicago, Illinois, on August 3, 2011, commencing at 1:15 p.m.

APPEARANCES:

ED FOX & ASSOCIATES
BY: MR. ED FOX
300 West Adams Street, Suite 330
Chicago, Illinois 60606
312.345.8877
on behalf of the Plaintiff;

CUISINIER, FARAHVAR & BENSON, LTD.
BY: MS. VICTORIA R. BENSON,
200 West Adams Street, Suite 430
Chicago, Illinois 60606
312.634.0412
on behalf of the Defendants.

DEFENDANT'S
EXHIBIT
tabbies
F

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 4

INDEX

| WITNESS: | Page |
|---|---|
| OFFICER KEITH HARRIS | |
| Direct Examination by Mr. Fox | 5 |

EXHIBITS

| Harris Exhibit No. | Page |
|---|---|
| 1 (Narcotics Section Supplementary Report) | 82 |
| 2 (Property Inventory Report) | 83 |
| 3 (Narcotics Section Supplementary Report) | 88 |
| 4 (Raid Activity Summary Report) | 89 |
| 5 (1505 Prerecorded Funds Sheet) | 90 |
| 6 (Inventory Report for Prerecorded Funds) | 91 |
| 7 (Contact Analysis Report) | 93 |
| 8 (Chicago Police Department Debriefing Report) | 95 |
| 9 (Lab Report) | 96 |
| 10 (Evidence of Purchase/Official Advance Funds) | 98 |

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 5

(Whereupon the witness was duly sworn.)

OFFICER KEITH HARRIS

one of the Defendants herein, called by the Plaintiff for examination, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FOX:

Q Okay. Could you state your name and spell your name for the record, please?

A Officer Keith Harris, H-a-r-r-i-s.

MR. FOX: All right. For the record, this is the deposition of Officer Harris being taken pursuant to notice and pursuant to all the applicable Federal Rules of Civil Procedure.

Have you ever had your deposition taken before?

THE WITNESS: No.

MR. FOX: All right. I'm going to -- what I'm going to do is I'm going to ask you a series of questions and then you answer to the best of your ability. The oath you take in here is the same oath you take in a court of law, so the same penalties of perjury apply.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 6

If you don't understand a question, feel free to say I don't understand your question, repeat or rephrase it. If you didn't hear me, same thing, ask me to repeat or rephrase it.

Also, if you want to take a break for any reason, we're not in the middle of a question, feel free to say so; you can do that. And also, I'll just ask you when you answer questions make sure you do it audibly because nods of the head and things like that don't work, okay?

THE WITNESS: Yes.

MR. FOX: And also, try to wait for me to be done with my question before you answer, and likewise I'll try to wait for you to be done with your answer before I ask the next question so we can have a clear record, okay?

THE WITNESS: Okay.

BY MR. FOX:

Q All right. In preparation for this deposition today what did you review, if anything?

A My narcotics purchasing report.

Q Okay. And you wrote that?

A Yes.

Q All right. Anything else?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 7

A The transcript.

Q The criminal trial transcript?

A Yes.

Q Anything else?

A That was it.

Q Okay. Did you -- there were other reports written, you're aware of that, in connection with the arrest of Michael Reno?

A Yes.

Q Did you review any of those other reports within the last week?

A No.

Q Did you talk -- outside the presence of your attorney, did you talk with any of the other three officers that were involved in the arrest of Michael Reno?

A No.

Q All right. Now, are you currently a Chicago police officer?

A Yes.

Q How long?

A Approximately 15 and a half years.

Q Okay. Did you review your answers to interrogatories?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 8

A What was the question?
Q Answers to interrogatories, questions?
A Yeah. That's what I was referring to when I mentioned transcript. If that's what that is, yes.
Q Okay. There's questions that were -- interrogatories that were questions that were asked of you, like your police background and so forth.
A Oh.
Q Which is different than the criminal trial transcript.
A Oh, no. I don't believe I saw that.
Q All right. What is your current rank and assignment?
A Police officer.
Q Okay. In what district?
A Narcotics unit.
Q Do you work out of any particular district?
A We work Area 2.
Q Okay. How long have you been on that assignment?
A Probably '09 for Area 2.
Q Okay. And what did you do before that?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 9

A Several different areas. Area 1.
Q Okay. Were you always -- how long have you been in the narcotics unit?
A Well, I got in narcotics in '09. No, I'm sorry. Take that back. '99.
Q All right. So at the time of the arrest of Reno, you were working in the narcotics unit in Area 2?
A Yes, I was.
Q All right. And then before you became a member of the Chicago Police Department did you work for any other police agencies?
A No, sir.
Q All right. Were you in the military?
A Yes, sir.
Q Which military?
A Navy.
Q Okay. Did you have an honorable discharge?
A Yes.
Q And what's your highest level of education?
A Some college.
Q Okay. Did you have a major?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 10

A No.
Q All right. And how old are you? Not your date of birth, just your age.
A 39.
Q All right. All right. Okay. Now, there was -- from reading the reports there was this thing called a surgical strike force?
A Yes.
Q Okay. Were you a member of that?
A Yes, I was.
Q And what is that?
A That's a type of event that's passed down from the supervisors to us informing us of a particular day that we're going to go to a particular area which they call hot spots, high targeted trafficking narcotic areas, and we just take it from there and see if we can purchase narcotics in those said areas.
Q Is that -- the surgical strike force, is this something -- is there a team of persons that comprise the surgical strike force?
A Well, it's not actually a force, so to speak. It's -- different teams get it at different times. So at this particular time it was our turn

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 11

for the particular hot spots that they had designated for that day.
Q All right. And then how do they -- to your knowledge how are the members for the surgical strike force for that particular date chosen?
A They're not chosen. It's just this team. It depends on what team. Certain teams they'll say, okay, it's you guys' turn, and the sergeant will inform us, hey, we have surgical strike for whatever day it is and they'll give us the areas of the hot spots and they'll target those areas and see if we can make illegal narcotic purchases from that area.
Q So when you say "hot spots," also you're talking about areas that are known to have a lot of narcotic transactions?
A Yes.
Q And then you referenced your team several times. What are you referring to when you say "our team"?
A Oh. Well, we have a team consists of probably eight officers, eight, maybe nine depending on -- I can't recall how many we had on our team during that time. And then there's also

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 12

other teams that are assigned with us or a -- other teams or one more team, and it depends on whoever they choose to do that with us.

Q And when you say "whoever they choose to do that with us" --

A What other team.

Q Right. And when you say "to do that," you're referring to the surgical strike force mission for that particular day?

A Yes.

Q All right. And then you said the team is roughly eight to nine members?

A Yeah, roughly.

Q All right.

A Depending on -- it varies.

Q All right. Do you guys work together for -- did you guys work together as a team unit for any particular period of time? In other words, were you with the same members of the team working together for a certain period of time?

A The team that I'm on, yes, we worked consistently together.

Q Okay. The team that you're on now, is it the same team that you were on when the arrest of

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 13

Michael Reno happened?

A Yes. There may be a few team members that came or left, but I'm still on that same team, yes.

Q Does the team have a name?

A Our team name -- it's not a name. It's a number. It's a letter number. We're B5, I believe.

Q And then this team, are all the team members members of the narcotics unit?

A Yes.

Q And have you been on this same team for how long?

A I've been on this team since 2009.

Q All right. And were you on a different team before that?

A Before that I -- I was at the training academy. I had left narcotics for approximately two years, but then I came back.

Q Okay. So because you left for two years you had to -- you went to the academy to retrain?

A No, I chose to go there to do some training.

Q All right. And why did you -- why did

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 14

you do that?

A I wanted to -- I was asked by a supervisor if I can help out with some things over at that training academy.

Q Okay.

A So I obliged to it.

Q And you said you've been with the narcotics unit for how long?

A Came into narcotics in '99.

Q Okay. And were you always on a team, a particular team, since '99?

A Yes.

Q Okay. And were you on more than -- you were on a team before -- before 2009 you were on a different team, I take it?

A Before 2009 that was the -- in between that I was at the training academy, but prior to that I was on other teams in narcotics.

Q Okay. How many other teams have you been on other than the one you were on -- other than the one you're on now?

A I would say approximate three teams.

Q Okay. And to your knowledge is everybody that's in the narcotics unit in Area 2 on a team?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 15

A Yes.

Q And just before you got on the narcotics unit what was your assignment?

A I was assigned to 11th District Police Department.

Q Patrol?

A Yes.

Q Okay. And then how did it happen that you got onto the narcotics unit?

A Filled out an application.

Q And this would have been somewhere around '98 or '99 you filled out the application?

A Yes.

Q Okay. Now, does your team currently -- well, let me ask, as of the arrest of -- as of the date of the arrest of Reno did the team have a leader, a team leader?

A No.

Q A team supervisor?

A Yes.

Q Okay. And who was the team supervisor as of the time of the arrest of Reno?

A We had Sergeant Darwin Butler.

Q Butler is B-u-t-l-e-r?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 16

A Yes.
Q All right. And is he still your sergeant?
A No.
Q Who is -- when did he cease being your sergeant roughly?
A Maybe the middle of 2000 -- probably the summer of 2009.
Q Okay. Did he transfer to another area or district?
A During that time, no, but now he's no longer in the unit.
Q In the narcotic unit?
A Right.
Q Where is he now; do you know?
A I don't know.
Q He's on the police department, though?
A Yes.
Q And then you said you filled out an application. Other than filling out the application, was there any other process that you had to go through to get onto the narcotics unit?
A An interview process.
Q Okay. And you were interviewed by who?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 17

A I don't remember the supervisor. It was the supervisor of narcotics unit.
Q Would that be a sergeant or higher than a sergeant?
A If I'm not mistaken, they're sergeants.
Q Okay. All right. Now, as I understand it, when you're assigned to the surgical strike unit, then what you say is that you go -- you're assigned to a certain hot spot in the area and your goal is to try and make a buy of cocaine?
A Basically, yes.
Q Okay. Is there anything wrong with what I said or is there more to it?
A You said "assigned to." You know, they mention targeted areas and they don't assign us to it, but if there's activity or they see something that could be activity in that area, we'll go over there and take a look at it.
Q Okay. And then they designate that as a surgical strike activity that day?
A Yeah, that would be a part of that mission number for that day.
Q All right. And the missions -- these surgical strike missions get a number?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 18

A I believe they do. If there is a number, it would be on the report for that event.
Q Okay. How often -- back in March of '09 how often would you be assigned to do a surgical strike mission on an average week or month, however it's most convenient for you to say?
A We may get it twice a month. It could be three times. It depends on what team that they use to do it.
Q Okay. Why do you say "it depends on what team"?
A Because there are different teams in our area, so I don't know how many teams but there are a certain amount of teams that they pick to do the surgical strike and depending on how much -- how many targeted hot spots they have. If they have a lot, they might pick more teams. If they have just a few that maybe one team can take care of, they may just utilize that one team.
Q All right. And you say roughly two to three times a month you would do something like this?
A It's a possibility.
Q Sometimes more; sometimes less?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 19

A It could be less, it could be more, depending on the needs of the department.
Q Okay. And then is the reporting that you do following an arrest different when you're on a surgical strike mission as opposed to when you make an arrest and you're not on a surgical strike mission?
A No. Same paperwork.
Q Okay. Is your supervisor different when you do a surgical strike mission as opposed to when you're not on a surgical strike mission?
A No.
Q All right. Now, I read that in the paperwork you used 1505 funds?
A Yes.
Q Which is funds where you record the serial number, correct?
A Yes.
Q Okay. Is there anything else unique about those funds other than the fact that you record the serial number?
A No.
Q And they call them 1505 funds?
A Yes.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 20

Q And what does that number stand for; do you know?
A I don't know.
Q Do you use these -- do you use 1505 funds when you are not doing a surgical strike mission as well on occasion or just when you do the surgical strike mission?
A For all narcotic buys.
Q All right. And explain to me the purpose of using 1505 funds when you do narcotic buys.
A The purpose is because it's already recorded through the department, and that's pretty much it.
Q Okay. And then the -- is part of the purpose to use those funds to prove -- to find them on the individual you do the buy from in order to prove that he did a buy?
MS. BENSON: I'm going to object to foundation.
Go ahead and answer, if you can.
A I don't know if it's to -- say the question again.
BY MR. FOX:
Q Sure. When you use -- let me preface it

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 21

like this. When you use 1505 funds you know what the serial number is of those funds, correct?
A Correct.
Q Okay. And then why do you want to know -- why do you use funds that are 1505 funds?
A Oh. Because if we're trying to locate that offender like during a mission like this, we'll see if they have that -- those funds on them during the time of arrest.
Q And that would help to prove that he actually did the buy?
A It doesn't necessarily prove that he did the buy because sometimes we don't get money back.
Q Okay. But if he does have the money back -- if he does have the 1505 funds on him you mark that as evidence in the case, in the criminal case?
A Yes.
Q And when you do use these 1505 funds, is it your goal to try and locate these funds after the arrest is made?
A Yes.
MS. BENSON: Object to foundation.
Go ahead.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 22

BY MR. FOX:
Q Now, who -- when you go out on a mission or when -- I'm going to withdraw that and start again.
When you go out for work and you use 1505 funds, does somebody distribute them to you? How does that work?
A We get those funds, we sign once a month.
Q And when you say you're assigned once a month, what does that mean?
A We sign out 1505 funds once for that month a certain amount, and after that at the end of the month we close out.
Q What does that mean, "close out"?
A That means we return funds back that weren't used.
Q Okay. So once a month you go get money, which is -- and you note the serial numbers on it and then you use them for the month and then you start using a new batch of funds the following month?
A Yes.
Q Okay. And to your knowledge are 1505 funds when they're recovered, are they used again

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 23

in subsequent buys?
A They can be used again.
Q Okay. And when you use 1505 funds you have paperwork tracing the use of those funds, I take it?
A Yes.
Q And in this case for the arrest of Reno you were the undercover officer who did the buy; is that right?
A Yes.
Q So had you used 1505 funds before arrest -- before the day that you arrested Reno?
A Yes.
Q On how many occasions roughly?
A Maybe once every day or every two days. It depends on what they have for us to do for that day.
Q All right. But it's something you often do, then?
A Often, yes.
Q By the way, how often -- you've testified in criminal cases roughly how often in your career in court? Or if you want to tell me how many times per month or per year that would work, too.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 24

A Could be twice a month, three times a month, depending on how many cases we have.
Q Okay. And when you -- the surgical strike mission that you did on the day that you arrested Reno was comprised of how many people?
A I can't remember.
Q All right. Is it the same persons that are on your team or does it become different people when you have a surgical strike mission?
A If they utilize different teams it would be us plus the other teams.
Q All right. But it would definitely be your team and maybe other teams as well?
A Yes.
Q All right. And when you do a -- now I'm asking you generally, not just for the day you did Reno.
And let me ask this first: Had you done surgical strike missions before the day that you arrested Reno?
A Yes.
Q And when you do surgical strike missions is it -- when you make an arrest of an individual, do you do just one arrest on that day and then

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 25

you're done and you go back and do paperwork or do you try to make more than one arrest?
A Usually I believe it's more than one arrest.
Q All right. And in this particular -- as I understood it from the testimony, there were -- in connection with Reno there were four folks involved in his arrest; is that correct?
MS. BENSON: I'm going to object to form.
Go ahead.
A I believe so.
BY MR. FOX:
Q Okay. You have yourself, you're the person who does the buy; is that correct?
A Yes.
Q Okay. And then you have a person -- at least in the case of Reno you have a person that's watching the whole transaction go down, correct?
A Correct.
Q And that would have been Gonzalez in this case?
A Yes.
Q All right. And then you had what I've seen labeled as enforcement officers?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 26

A Yes, sir.
Q Okay. And there were two persons doing that in this case; is that right?
A Right.
Q And that would have been Hoffman and Shaar?
A Yes.
Q All right. And then was there anybody else involved?
A I'm sure there were, but they didn't play a big part in this particular event.
Q All right. And then what is -- what does -- how do you label the role of Gonzalez? Is he called the surveillance officer or something else?
A Yes, surveillance officer.
Q All right. And then Hoffman and Shaar are labeled as the enforcement officers?
A Correct.
Q And you're labeled as the what, the undercover --
A Buy officer.
Q Buy officer, okay.
Are there any other designations for

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 27

people other than the enforcement officers, surveillance officers, and buy officers that are involved in the surgical strike mission?
A That's pretty much all the positions we have for doing these type events.
Q All right. And then when you folks -- when you folks work on a surgical strike mission, how do you communicate with one another?
A Nextel.
Q And are these phones, do they have phone numbers, or how do they work?
A No phone numbers. Just radio communication.
Q Okay. To your knowledge are the radio communications recorded anywhere?
A No.
Q Do you ever communicate using your own cell phone?
A No.
Q All right. Or a department-issued cell phone that's not a Nextel phone?
A No, I haven't.
Q To your knowledge have you seen other members of your team use their own cell phone?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 28

A No.
Q And then as part of -- on your narcotics unit do you keep track of the number of arrests that you folks make per week or per month or per year?
A I'm not -- I think the supervisor does.
Q All right. You have a way to look up in the CLEAR system how many arrests you've made, though; is that correct?
A I believe, yes. If our name is on the arrest report it might show up. As long as it's placed on the arrest report it would be.
Q All right. Have you ever like had occasion to look at your own -- look up your own name and see how many arrests you've made in a given period of time?
A Yes, I have.
Q Okay. And what purpose would you do that for?
A Just out of curiosity activity-wise.
Q All right. Is there -- is there -- to your knowledge have there ever been any competition amongst either the individual officers or teams in connection with how many arrests that they make?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 29

A No, never.
Q Is there -- have any supervisor officers ever indicated to you anything to the effect that they want a certain number of arrests per day or per week or per month or anything like that?
A No, sir.
Q And when you're on a narcotics unit your primary focus, I take it, is narcotics activity; is that correct?
A Yes.
Q You work in an undercover capacity; is that right?
A Yes.
Q In that capacity on a narcotics unit, do you ever do things like write traffic tickets, routine traffic tickets?
A No, I don't.
Q All right. How about a -- have you been involved in investigating other crimes, not narcotic crimes, since you've been on the narcotics unit?
A No.
Q So your focus is pretty much narcotics?
A Yes.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 30

Q And since you've been on the narcotics unit have you applied for any promotions?
A No, I haven't.
Q Have you applied to work in any other district or area?
A No.
Q And you still work Area 2 generally?
A Yes.
Q Okay. Now these folks -- I'll go one by one. Hoffman, is he still on your team?
A He's never been on my team.
Q Okay. So he was part of the surgical strike mission on the day of Reno's arrest, though, correct?
A Yes.
Q Okay. Was he on a different narcotics team to your knowledge?
A Yes.
Q Okay. Had you ever worked with him before on any sort of mission before the day of Reno's arrest?
A I worked with him years prior to this event.
Q Okay. So you knew who he was?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 31

A Yes.
Q All right. And then what about Gonzalez, was he on your team as of the day of Reno's arrest?
A Yes.
Q And then what about Shaar?
A Shaar.
Q Shaar.
A He's on a different team as well.
Q Okay. And that's not unusual to put different team members together for a surgical strike mission or is it unusual?
A No, it's not unusual.
Q And then -- okay. Had you known Shaar before the day of Reno's arrest?
A No.
Q That was the first day you'd met him?
A I can't recall.
Q But at any rate you didn't know him well?
A I didn't, no. No.
Q Did he come from a different team to your knowledge?
A Well, he's -- I don't know what team he came from. I know what team he's on. So I knew, you know, who he was, but as far as anything else

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 32

I'm not sure.
Q And you don't recall working with him before this day of Reno's arrest?
A I can't remember.
Q Okay. Was he on the same team as Hoffman to your knowledge?
A I can't recall I don't think.
Q All right. Okay. On the day of Reno's arrest did your surgical strike mission team make an arrest of anybody else?
A I can't recall.
Q Do you recall if you had done any other surgical strike missions within a week before or a week after the one of Reno's arrest?
A No.
Q You can't recall one way or the other?
A No, sir.
Q Okay. And in other cases that you've done where you've used marked money to make arrests, has there been occasions that you are unable to recover the money?
A Yes.
Q Can you give me a percentage of how often that happens roughly?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 33

A No, I can't.
Q Can you tell me if it's more than 50 percent or less than 50 percent of the time?
A See, I can't tell because if we're doing a buy-bust then it's different than doing a mission. So some incidents we know we're not getting money back because it's an ongoing investigation.
Q Right.
A And on the incidents where there's a buy-bust, we try to get the money back. So we do so many different -- so many of those that it's hard to say a percentage.
Q Right. The thing you did with -- the arrest of Reno, that was a buy-bust operation?
A Yes.
Q All right. And so it's not an ongoing investigation?
A No, it's not.
Q And when you say "buy-bust," that means you make a buy and then you make the arrest soon thereafter that day?
A Yes.
Q All right. And in those situations you

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 34

try to get the money back?
A Correct.
Q All right. Before the day of Reno's arrest did you to your knowledge ever have an encounter with him?
A No, sir.
Q Okay. Did you know who he was?
A No.
Q Okay. Let's go to the day of the arrest.
It was in the vicinity of 79th -- East 79th and Essex; is that right?
A Yes.
Q All right. Were you familiar with that area?
A Not necessarily.
Q All right. Had you made any arrests to your -- do you recall making any arrests at that intersection, 79th and Essex, at any time before that day?
A No.
Q Is that -- that's within the Area 2?
A Yes.
Q Okay. So did you know before that day that you were going to be assigned to a surgical

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 35

strike mission that day or do you learn about that on the day you come into work?
A We usually learn about that the day before, one or two days before.
Q And what watch were you working then?
A Mornings. That would be the second watch.
Q And so what is that roughly, like 9:00 to 5:00?
A Could be. Sometimes we start earlier, but it's normally days.
Q All right. So within a day or two before, what was it, March 28th you would have known that you were going to do a surgical strike mission?
A Yes.
Q Okay. And when do you learn who your team members are going to be?
A Probably the day of could be. We might know the day before.
Q All right. So at any rate, on March 28th you go to work and you knew you were going to do the surgical strike mission that day when you went to work that day; is that right?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 36

A Yes.
Q And did you know where it was going to be?
A No.
Q Okay. So on that day you're assigned the location?
A Yes.
Q Okay. And who assigns you the location?
A The sergeant. Usually he has a list of locations, and we just start out with what he gives us.
Q Okay. And you were assigned to the area I take it -- well, tell me, what area were you assigned to?
A Area 2.
Q In what location were you assigned to do the --
A We're not assigned to a particular area. Area 2 is a big area.
Q Right.
A So they'll just say the address of whatever, and we'll go to it.
Q Okay. My question came out bad.
So they actually give you an address

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 37

to go to?
A They give us a vicinity. They don't give an exact address. They say the vicinity of 78th and whatever street or 79th and -- something like that.
Q Do you recall what vicinity they gave you, what they told you, on the day of Reno's arrest?
A They did say 79th around Essex to whatever the street is. I can't remember the other.
Q But they give you another street to the east or west or north or south?
A Possibly.
Q And then what do they tell you about that area, if anything?
A They don't tell us anything in particular. Just a high-traffic area.
Q All right. And when they say "high-traffic area," it's your understanding that there's a lot of narcotics activity going on?
A Yes.
Q All right.
A A lot of complaints from that area.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 38

Q Did you hear about any specific complaints about a person matching Reno's description on that day?
A No.
Q All right. Did you get any specific complaints about any particular persons that day, any descriptions, any names, anything like that?
A No.
Q Did you know any of the store owners in that area of 79th and Essex?
A No.
Q Had you ever talked to them -- did you talk -- had you ever talked to any of the store owners prior to March 28th of '09 in that area of 79th and Essex?
A No.
Q So on this particular day once you know where you're going to go -- before I get there, let me ask you this: Are you always -- when you do these -- in your job when you're doing buy-bust operations are you always the buy officer or do you sometimes do different roles, like enforcement or surveillance?
A No, sometimes I might do surveillance.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 39

Q All right. Okay. And then -- okay.
So on this particular day does somebody -- does your supervisor or your sergeant hand out the assignments that you're to have that day? By assignment I mean enforcement officer versus surveillance versus the buy officer.
A Well, the buy officers, we have different buy officers, so whoever wants to make an attempt to go through to try to -- for that area.
Q All right. So when you say "we have different buy officers," does that mean you have different officers that routinely do buys as opposed to other officers?
A Yes.
Q All right. And so you are somebody who routinely does buys, I take it?
A Yes.
Q All right. And, I take it, if you're doing it in African-American neighborhoods you would be a guy that would do that as opposed to a white guy?
A Not necessarily.
Q No? All right.
Is there any particular qualification

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 40

to be a buy officer?
A No. Anybody can buy if -- you know, it depends on, I guess, how you just go in there and present yourself.
Q All right. Okay. So on this particular day did somebody assign the different roles of you folks or not? Do you remember how that worked?
A Well, pretty much I already know what my role is.
Q Because you're going to probably be the buy guy?
A Probably.
Q All right. And do you know if somebody else assigned the other roles of the enforcement officers and the surveillance officers?
A I'm not sure how they get their roles assigned.
Q Do the members of the surgical strike team -- well, on this -- let's just talk about this date. On March 28th of '09 do the members of your surgical strike team have a meeting about how you're going to go about conducting this buy-bust?
A Yeah, we have a brief role call, tell us about the area and, you know, the location.

Reno vs City of Chicago
Officer Keith Harris - 08/03/2011
Page 41

Q All right. And then you guys roll out in different cars?
A Yes.
Q And you're all in undercover cars, plain cars?
A Yes.
Q And so on this particular day the members of your team, who included yourself, Gonzalez, Shaar, and Hoffman, knew that you were going to try and make a buy that day in that area?
A Yes.
Q Okay. And so did Gonzalez know in advance the intersection that you were going to go to?
A No.
Q Okay. So how did -- all right. As I understand -- well, did you know where he was going to go to before you went out there to make the buy that day?
A Well, I knew he was going to the vicinity of the area that's given to us.
Q All right.
A And I just wait.
Q And you just wait for what?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 42

A I wait for the surveillance to say, hey, come to this particular area, I'm set up here, and we can try to buy narcotics from that area.
Q Okay. And he tells you this over the radio, I take it?
A Yes.
Q All right. And before you go out there to do that, you know that you also -- in addition to the surveillance officer, you know who the enforcement officers are?
A Pretty much. We have a lot of different enforcement depending on how many teams we have, so -- but enforcement know to listen up for them if they're called, they know they can kind of be reached. I mean, they know that we're calling for them.
Q Okay. And so let me understand the roles. Your role obviously is to try and do the actual buy, correct?
A Correct.
Q And what's the role of the surveillance officer?
A Surveillance officer watches the buy officer.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 43

Q For safety reasons, among other things?
A Yeah, safety and to --
Q Document what's going on?
A Yes.
Q All right. And then what's the role of the enforcement officers?
A The enforcement is also for safety in case something goes wrong, we need help or anything, and also to detain a person after a buy is made.
Q All right. And then generically, not particular to this case, tell me what's supposed to happen in a surgical strike mission buy-bust operation.
A Surveillance goes out there. He may see some players in the game, so to speak. He'll get on the radio and say, hey, why don't you try -- there's a guy out here, why don't you try him and then see if, you know, anything will happen.
And then me as the buy officer, I'll come to that location. I'll talk to that person and see if I can get any info or narcotics out of him or he might send me somewhere, he might sell to me, and the purchase will happen if he's willing.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 44

Q Okay. And then what happens after the purchase is made, generically speaking?
A After the purchase I go back to my vehicle. I'll get out of the immediate area. I radio to the team members.
At that point in time the sergeant will send enforcement out there. Once they have him in sight and detain him, then I'll go back to the area that I bought from, the area of detainment, and just go past there and say, hey, either that's the right guy or if it's the wrong guy.
Q And I take it -- who describes the guy to the enforcement officers that the buy has been made, is it the surveillance officer or you?
A Well, actually I do the final confirmation.
Q Uh-huh.
A Surveillance officer is on the spot and he sees things are going on, what appear to be a narcotics transaction, he'll call that out, and after it's all said and done I get on there and make a final clarification and say, hey, guys, it is a positive or something to that nature.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 45

Q And how do you go about doing that? Do you actually drive by and look?
A Well, I'll go on my Nextel radio and give a description and location. And after enforcement has the individual detained, I'll drive past the area of detainment and that's when I'll via Nextel again say, hey, that's the right guy you have.
Q Okay. Because you're actually visually looking at the guy that's being detained?
A Yes.
Q Okay. And do you give -- before the detainment is made, before the enforcement guy comes out, do you give the description of the guy or does the surveillance officer? I forgot what you said.
A Say it again?
Q After you make the buy and you leave the immediate area, do you give the description of the person you purchased from or does the surveillance officer do that?
A Well, during that whole process the surveillance has the close communications with the team that I can't hear because I don't have my radio on me during that time.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 46

Q Right.
A But once I get in the vehicle, I'm sure at that point in time surveillance has already told them what's going on. I'm just reclarifying what I did out there.
Q All right. So let's go now to this particular day, March 28th of '09. Do you remember what time of day it was that you went out to the area of 79th and Essex?
A I believe maybe 4:00 something in the evening.
Q In the afternoon?
A Afternoon, yes.
Q And before you went out there to that intersection, were you given any information about what was going on at that intersection?
A Yeah, I was given the information by the surveillance officer.
Q And what information did he give you?
A He said a male was out there, gave a description, and said he was talking to several individuals that were passing by at that corner location.
Q And that would have been Gonzalez that

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 47

said that?
A Yes.
Q Did he say that he observed any hand to hand -- what appeared to be hand-to-hand transactions while he was observing the male talk to several individuals?
A To my knowledge, no.
Q Did he describe the male other than saying there's a male?
A Yeah, he described. He gave a clothing description.
Q And he said he was an African-American guy?
A Yes.
Q Do you remember the clothing description he gave you?
A Black skullcap, black either jacket or a hooded sweatshirt, some black pants, and distinctively some orange stitching that was on the black pants.
Q So after you got this information what did you do?
A I told him I was going to -- told him what direction I'll be driving and park my vehicle,

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 48

and then I shut down my radio and get out and at that point enforcement -- sorry, surveillance is given details after I get out of the vehicle.

Q Okay. What do you mean given details after you get out of the vehicle?

A After I shut down my radio, I'm out of the vehicle making my approach to the individual that was pointed out, and so now enforcement -- I mean surveillance has to complete their...

Q Right. And so did you know where the surveillance car was before you got to that intersection?

A No, I don't -- didn't know that.

Q All right. So then where did you drive to that day?

A I drove to -- close to the corner of -- I was on Essex just south of 79th Street.

Q Okay. And Essex is a north-south street; is that right?

A Essex, yes.

Q All right. And you said you parked south of 79th on Essex?

A Yes.

Q And then when you got out -- what did you

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 49

observe when you got to that intersection?

A When I got out of the vehicle I observed a subject that surveillance had called out and I walked across the street, northbound across the street, and approached him. He was standing on the corner.

Q Okay. And this is the person who you later learned was Michael Reno?

A Yes.

Q And can you give me a description of who it was?

A The clothing description?

Q Yeah, the same clothing description?

A Same clothing description I stated, male black, black skullcap, black shirt, coat, top, or whatever it was, and the black jeans.

Q Okay. And before you made any verbal contact with him, what did you observe him to be doing?

A Actually he was just standing -- he was just standing around on the corner.

Q Was he talking to any individuals that you saw?

A I didn't see him talking to anyone.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 50

Q Was he yelling anything or shouting anything or saying anything that you could hear such as "rocks, rocks" or anything like that?

A No.

Q Okay. In your work you've learned that narcotics dealers sometimes stand on streets and say things like "rocks, rocks" or something to that effect?

A They used to. A lot of them they don't say a lot of anything now because it's too much of a giveaway.

Q All right. In any case, you didn't hear him saying anything?

A No.

Q Okay. That's correct?

A Correct.

Q Okay. How long did you observe him for before you made verbal contact with him?

A During from the time I got out of the vehicle, which maybe 45 seconds or so.

Q All right. And then you were in an unmarked car, correct?

A Yes.

Q Plainclothes?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 51

A Plainclothes.

Q How were you dressed?

A I can't recall what I had on that day.

Q All right. And which corner was Reno on?

A He was on the northwest corner.

Q And do you remember what kind of store -- is there a store over there?

A On that corner he was standing I believe there is a store. I don't know what kind of store it was.

Q Do you remember if it was a cellular store?

A Possibly. Possibly. I believe so.

Q Okay. So -- and you said the northwest corner? I'm sorry.

A Yes, northwest corner.

Q All right. And so did you actually walk over to the northwest corner to talk to him?

A Yes.

Q And -- okay. And how was -- what was the weather like that day; do you remember?

A I can't recall.

Q Was it raining or snowing or anything; do you remember?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 52

A I don't know. I really don't know.
Q This is the end of March, so it still would have been light out?
A Yes.
Q All right. So when you approached him did he appear to take any evasive action or do anything suspicious?
A No.
Q Okay. When you approached him who talked first?
A I did.
Q And what did you say to him?
A I asked him if he had any rocks.
Q And that's street slang for cocaine?
A Yes.
Q That was the first thing you asked him?
A Yes.
Q And how did he respond to you?
A He said follow me.
Q Did he say anything else?
A No.
Q He didn't ask you like who are you or anything like that?
A No.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 53

Q And -- okay. And so -- so I guess this entire conversation took just a matter of seconds?
A Yes.
Q All right. So then when he said follow me, what was the next thing that happened?
A We walked southbound across the street to a -- in front of another store location. So we were on the southwest corner at that point.
Q So when you say you "walked southbound across the street," you would have walked across 79th Street, then; is that right?
A No, I walked southbound -- sorry. Southbound on Essex.
Q But you're crossing 79th Street?
A Yes, across 79th. Yes.
Q Right. Okay. Now, you're on the southwest corner of 79th and Essex?
A Yes.
Q All right. And so when you got to the southwest corner -- did you have any conversation while you were walking?
A No.
Q When you got to the southwest corner of 79th and Essex what happened?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 54

A He asked me how many did I want and at which time I told him one, and he said give me the money.
Q Now, let's talk about that for a minute. You came there with 1505 funds that day?
A Yes.
Q And how much money -- 1505 funds did you have with you?
A I don't recall.
Q Did you have more than two fives?
A Probably so.
Q Would there be a record of that somewhere of what you had with you that day?
A No.
Q And then when he said to you how many do you want, you understood what he meant by that?
A Yes.
Q And because of typical street slang for narcotic sales?
A Yes.
Q Okay. And what does that mean when he says how many do you want?
A How many bags of narcotics do I want.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 55

Q And how much is contained in each bag generally?
A One.
Q And is it a tenth of a gram in each bag generally or how does that work?
A .2 grams usually.
Q Usually .2 grams per bag?
A Uh-huh.
Q And how much is a bag?
A One bag is $10 generally.
Q Okay. So he said how many do you want, and you said one; is that what you said? I'm sorry.
A Yes, one.
Q Okay. And then any more conversation at that point?
A No.
Q Was there any exchange of money at that point?
A Yeah, I gave him the $10.
Q And that consisted of two fives?
A Yes.
Q Okay. You gave him -- while you were on the south -- let me withdraw that.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 56

So I make sure I understand the chronology, you gave him the $10 after you told him that you wanted one?

A Right.

Q Did he tell you how much that was or did you know or how did that happen?

A No, generally it's -- usually that's how it goes. It's usually $10 per bag of narcotics that you purchase.

Q Okay. So you gave him $10, which consisted of two fives, and then what happened? What was the next thing that happened?

A He took the money, he went inside of another store type location, and I waited outside.

Q Now, at this time did you know where Gonzalez was?

A No.

Q And when you said he went inside another store, was this the store at the corner of 79th, the southwest corner of 79th and Essex?

A Yes.

Q And what kind of store was that?

A I don't recall. Some type of convenience store, I believe.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 57

Q With like food in it and stuff?

A Yes, soda, chips.

Q Okay. Could you see inside the store from where you were standing?

A No.

Q And when you -- when you were talking to Reno, I take it you're looking him up and down to see if he might have a weapon or if he might have narcotics on his person; is that fair or no?

A Not necessarily, no.

Q Okay. Well, did you notice anything unusual about his appearance when you were talking to him by the time -- let me withdraw that and start again.

Did you notice anything unusual about his appearance by the time that you had given him the money?

A No, except the description that I looked for when I first approached him.

Q And when I say "unusual," were there any bulges in his clothing that looked out of the ordinary?

A No. Not that I can recall.

Q All right. And so when he -- when you

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 58

gave him the $10 he walked into the store; is that correct?

A Yes.

Q And then what did you do?

A I waited outside the store.

Q Okay. And you're not in radio contact with anybody?

A No.

Q All right. And then how long did you wait for?

A About a minute.

Q And then after roughly a minute what happened?

A He reemerged from the store. He handed me the one small plastic knotted item.

Q And it looked to you like -- was this a typical baggy you would see cocaine placed in?

A Yes.

Q And it was -- and it looked like rock cocaine?

A Yes.

Q As opposed to powder?

A Rock, yes.

Q All right. And it was a typical amount

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 59

that you would pay $10 for based on your observations of it?

A Yes.

Q Did he ask if you wanted more than that or was there any further conversation about the narcotics?

A No other dialogue.

Q So he hands you the narcotics in a plastic bag; is that correct?

A Correct.

Q You take them, and then what happens?

A I just walk away and go back to my vehicle.

Q Okay. Could he have been in the store longer than a minute or was it --

A I didn't have a watch to time him. It could have been a little longer. Approximately I think maybe a minute.

Q All right. Was there any foot traffic in or around the store during the minute that you were waiting?

A I don't recall.

Q Okay. Did you see any -- do you recall seeing any foot traffic the entire time that you

Reno vs City of Chicago
Officer Keith Harris - 08/03/2011
Page 60

were out there up until the time that you had received the narcotics?

A Yeah, I'm sure some regular foot traffic that had nothing to do with the narcotic sales.

Q Okay. And up to the time that you had this exchange with Reno had you seen him do any criminal activity?

A No.

Q Then when -- after he gave you the baggy, you said you turned around and walked away; is that correct?

A Yes.

Q What did you do with the baggy?

A Put it in my pocket.

Q Which pocket?

A Can't recall.

Q Okay. And did you see what Reno did after he gave you the baggy?

A No.

Q You don't know if he stayed outside on the street, went in the store, or walked somewhere else?

A I don't know. My back was towards him, and I walked southbound.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 61

Q Okay. Could you hear -- when Reno -- after you paid Reno and he went into the store, did you hear him saying anything to anybody in the store?

A No.

Q Could you hear any conversation from inside the store while you were waiting outside?

A No.

Q Okay. And have you told me about all the conversation that you and Reno had with each other?

A Yes.

Q And so then you said you walked southbound from that location?

A Yes.

Q And that would have been towards your car?

A Yes.

Q All right. And that took you, what, less than a minute to get to your car?

A Yes.

Q All right. And so then when you got to your car, what did you do?

A I drove off from the immediate area and I radioed to the team members of what happened, gave

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 62

a location, description.

Q And the location you gave was what? What did you say?

A I said the corner of 79th and Essex.

Q Would you have said the southwest corner or just this corner?

A I don't believe I distinctively said the direction.

Q All right. Did you say what kind of store? Did you describe the store that he went into?

A No.

Q Did you say -- did you describe what had just happened when you got on the radio?

A Yes.

Q And what did you describe?

A I described him going into -- me handing him money, him going into the store, coming out and giving me the narcotics.

Q And did you specifically tell people that you had given the guy two five dollar bills?

A Yes, I did.

Q And so then -- as you're doing this you're leaving the area; is that right?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 63

A I've left the area already.

Q All right. You've gotten in your car and you're gone?

A Right.

Q Okay. Where did you go?

A Usually I go a few blocks over. No distinctive location.

Q Do you remember where you went in this case?

A No.

Q And then by the time you leave it's your understanding now that -- well, by the time you radio what happened it's your understanding now that the enforcement team is going to take over?

A Yes.

Q Okay. So after you get to your -- well, did you -- after you got to your location, your next location where you were waiting, did you have any conversation with any other team member?

A No.

Q Okay. Did anybody radio to you and ask you any questions?

A No.

Q Okay. And so after you got to your next

location, how long did you wait there before you were either told something or you heard something or you moved from that location?

A Once the sergeant supervisor tells enforcement to go to the area, it's safe to detain the subject, that's when enforcement goes and enforcement has the subject in custody, that's when I drive past that location and positively identify him as the person that sold the narcotics.

Q So did you hear -- do you hear the sergeant on the radio say -- tell the enforcement to go and do what they're supposed to do?

A Yes.

Q How long did that take from the time that you did the buy to the time you heard the sergeant instruct the enforcement officers to go to that location roughly?

A Somewhere in between maybe 11, 15 minutes, something like that.

Q Okay. And did the sergeant in this case give a description of the guy that you had bought the narcotics from?

A I don't believe the sergeant gave out the description. I believe just enforcement, myself

and enforcement.

Q Well, I mean, how does enforcement know who to detain?

A Enforcement keeps constant -- enforcement listens to the radio conversations with myself and the surveillance officer.

Q All right. So they had heard the description being given at that time, I take it?

A Yes.

Q All right. So if I understand the order of this correctly, after you leave, after you make your buy and you leave, you get on the radio and you tell the surveillance officer what you just did; is that right?

A Well, normally the surveillance officer is telling other team members before I get in and confirm what just happened what he saw.

Q Right.

A And after he give his interpretation of what he saw, I come in and then I clarify if whatever he said, which I don't know, is correct or not, which at that point in time everything was pretty much correct that what he saw and what I did.

Q But, I take it, you added that you paid for this -- these narcotics with two five dollar bills so the enforcement officers know this?

A Yeah. I tell everything that happened. Enforcement listens and he hears -- they hear everything that we discuss.

Q All right. And then you said you waited for roughly 11 to 15 minutes before you hear something else about to do something; is that right?

A That's before the enforcement detained -- at some point they're waiting for the right moment to detain the subject.

Q Okay. So then you hear the sergeant come on the radio and tell the enforcement to go detain?

A Yes.

Q Okay. And that was roughly 11 to 15 minutes after the buy; is that what you said?

A Yeah, I believe so.

Q All right. And then what do you do after you hear the sergeant give the orders for the enforcement team to go detain the guy?

A I just wait until enforcement actually have the guy in custody and at a point where he can

be viewed by me.

Q Okay. So did you overhear anything over the radio about the actual detention of Reno by the enforcement guys?

A They went inside of a -- they had to go inside of a store and they brought him out.

Q Okay. And then after -- and you heard that, I take it, over the radio?

A Yes.

Q And do they announce that after they went inside the store and brought him out?

A I believe surveillance mentioned that enforcement is inside of the store with the subject and at some point enforcement, some minutes later, don't know how long, but enforcement then brought the subject outside, and that's when I drive to the area of detainment to positively identify him.

Q So how long after the buy was it roughly that you actually drove by the area?

A Probably about 15 minutes or so.

Q All right. And so -- and does somebody instruct you to do your drive-by and make your identification?

A No. Once they have him out, I just --

either enforcement say -- you know, they bring the guy out and I just come across there and say I'm about to drive by so I can take a look at him.
Q All right. And so you did that in this case?
A Yes.
Q And then what did you observe?
A I observed them have the subject standing outside the location.
Q And when you say "the subject," you're talking about Reno; is that right?
A Yes, Reno.
Q Okay. Was he handcuffed when you observed him?
A No, I don't believe so.
Q And was he the guy that you made the buy from?
A Yes.
Q Okay. And then after you drove by -- and, I take it, when you drive by you don't stop, you just drive by and observe from your window of the car?
A Yes.
Q All right. And you don't -- did you have

any verbal communication out your window to the enforcement officers?
A No. No. Never.
Q So you maintain your cover?
A Yes.
Q All right. And you drive by and you get on your radio, then; is that what you do?
A Yes.
Q And you tell -- and what did you do?
A I say it's a positive, that's the guy that you have.
Q And then what did you do after you did that?
A I drive -- I actually park somewhere else and wait for further instructions of what's our next location as far as processing or anything else to be done for that particular event.
Q All right. So there's occasions where you would go to your next location to try and do another buy?
A Well, it depends. I wouldn't -- I have paperwork to do, but it depends on what the supervisor wants. So he might have a certain amount of people go somewhere, you know.

Q So what happened in this case?
A In this case the supervisor said let's relocate to Area 2 to process this incident.
Q And when he says "process," that means do all the paperwork?
A Yes.
Q And so did you go directly to Area 2 or had you been stopped for some period of time?
A No, I went to Area 2.
Q And so when you got to Area 2 what did you do?
A Started doing my paperwork.
Q Okay. And what paperwork did you fill out?
A Do my narcotics purchasing officer's report.
Q When you got to Area 2 was Hoffman and Shaar already there?
A No, they were shortly -- they were a little bit behind me.
Q When you say "a little bit behind me," a matter of minutes?
A Possibly.
Q And what about Gonzalez, was he already

there?
A I can't recall.
Q So after you got -- after you got there and you saw Hoffman and Shaar, did you have any conversation with them about the arrest?
A No.
Q By the way, when you drove by and made the identification did you see anybody -- any other citizens out in the immediate vicinity of where the detention was being held, where Reno was being detained?
A Not to my knowledge.
Q Okay. And after you got back to the station you saw Hoffman and Shaar. At any time that day was there any conversation that you had with them in which they discussed that they didn't find any of the 1505 funds?
A Yes.
Q And what was that conversation?
A Just asked did they find any money, did they find the 05, and they said no.
Q Did they indicate what they did to look for it?
A I don't recall.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 72

Q Did -- was there any conversation in connection with whether they found any more narcotics on Reno?
A I don't believe so.
Q Okay. Who's responsible for inventorying -- who's responsible for inventorying the narcotics?
A Whoever the evidence officer is.
Q And who is that?
A Hoffman, I believe, was the evidence officer that day.
Q The same Hoffman who did the detention?
A Yes.
Q Was the enforcement officer?
A Yes.
Q Okay. Because you have the narcotics in your possession --
A Yes.
Q -- right?
And then what did you do with it when you got back to the police station?
A When I saw Hoffman I handed it to him, at which time he placed it in a narcotics envelope.
Q And when you gave Hoffman -- you gave him

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 73

the entire baggy?
A Yes.
Q Just the way you received it from Reno?
A Yes.
Q And did you actually see Hoffman place them into an envelope?
A Yes.
Q Okay. And then when he places it in an envelope there's -- you write -- there's things he writes down on the envelope, the inventory number and so forth?
A When the inventory number is provided he would then write it on there at some point.
Q Okay. And how does the inventory number get provided?
A We usually when we get all the numbers for our reports, we put it on one like a -- it's like a scratch sheet of paper, and after all the numbers get placed on there we'll Xerox copy them and everybody who is doing paperwork regarding the incident, they would get a copy of that.
Q Is this a typewritten document or a handwritten?
A It's handwritten.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 74

Q And who gives you the scratch paper with all the numbers?
A We just have them. Just something we use generically in the office.
Q Who assigns the numbers, I guess, is what I'm getting to?
A The numbers are assigned through computer-generated or we call OEMC for certain numbers, and once we get all the numbers we just write it -- handwrite it down on this paper and then we'll disseminate it with our -- throughout our team.
Q And in this case the inventory numbers in particular?
A Uh-huh.
Q How do you get those numbers assigned?
A Well, the inventory numbers are computer-generated. Once they're generated, then someone will write it down on that piece of paper that I spoke about.
Q Uh-huh. And then -- and who did that in this case?
A I don't recall who did that. Anybody can actually -- once we say the numbers, people who

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 75

have somebody -- somebody might be writing it down and that's how it works.
Q Okay. And then who -- and you say you believe Hoffman was the evidence officer in this case?
A Right, he was the evidence for my narcotics.
Q Right. Was there evidence -- and there's evidence officers for other narcotics, I take it?
A Not for this case. I mean, I gave him my narcotics, so I believe he did that inventory for that.
Q Okay. So he wrote the inventory sheet for that?
A It's a computer-generated -- inventory is computer-generated.
Q Uh-huh.
A And once the number's generated, that's when we say the number, whatever the number is, and you write it down on a sheet.
Q All right. And then what happens to that piece of scratch paper where all the numbers are written down?
A Gets tossed after we finish doing all our

paperwork.
Q Okay. What numbers are put on the scratch sheet with all the numbers, which different numbers are put on it?
A We have an RD number, we have an event number, we have a mission number, we have team numbers, we have inventory for narcotics, we might have inventory for additional money if we have any, and that's about it.
Q All right. And is there one person assigned to do that or no?
A They're not assigned. Somebody might say, hey, I'll get the numbers, I'll write down all the numbers for you guys or whatever.
Q All right. Let's look at some of these reports.
And on this particular day, having talked about this arrest as we've talked about it, do you remember now -- has it refreshed your recollection as to whether or not you made any other arrests that day?
A I don't recall if I did or not. Just this one so far.
Q All right. So I'm going to show you --

I'm not sure if I'm going to mark it yet till after I show you.
I'm going to show you the arrest report.
A Okay.
Q And my question is going to be if you wrote anything that's on the arrest report.
A Did I write on this arrest report?
Q Right, either page. Any of the pages of it.
A I can tell you right now I don't touch the arrest report.
Q Okay.
A Whoever does the arrest activity they generate that, and I have no involvement with this. Just my purchasing report.
Q So based on your understanding who would have written this arrest report?
A Whoever attested to it, I believe.
Q Okay. So if this says the attesting officer was Hughes, does that mean he's the one that wrote it?
A Not necessarily. He might -- he could have -- he could have been the officer that

actually got into the arrest report system for someone and said, hey, I pulled it up for you, go ahead and do your arrest.
Q Uh-huh.
A We all can pull up the reports, but it's a matter of the person who actually types in the information for it.
Q Okay.
A So I'm not sure -- a hundred percent sure on that one.
Q Generally speaking, is it one of the officers that's involved in the arrest that does the arrest report?
A Usually it is.
Q All right. And do you know who Hughes is?
A I have no clue.
Q You don't recognize him as being somebody from your team?
A I really don't know.
Q All right. Then I'm going to show you -- this next document I'm going to show you is -- it's called a Narcotics Section Supplementary Report.
Did you write anything on this

document?
A This is my report.
Q All right. And so you authored the second page of it as well?
A Yes.
Q All right. And let me ask you about some of the things on here.
You've written that the time of the occurrence was 1648, which would place it at 4:48 p.m.; is that correct?
A Correct.
Q All right. What does -- in the first page under offenders and there is a -- it says relation 024, what does that stand for?
A No relation to me.
Q And then you say not gang related because he didn't have any -- as far as you knew he had no gang affiliation?
A As far as I know, no.
Q Okay. And then it says on the -- it says this is a narcotics (indicating) -- I'm pointing to this line here (indicating), this is a narcotics investigation section and then somebody handwrote purchasing?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 80

A Yeah, because it's blacked -- it's not -- it's purchasing officer's report. I did the purchase for this.

Q Do you know whose handwriting that is where it says purchasing?

A I don't know. Somebody might have wrote it in there because it's not clear on here.

Q Right. Okay.

A Probably didn't -- bad Xerox copy or something.

Q Okay. All right. And then that's your signature down at the bottom left?

A Yes.

Q All right. And then if we can go to the next page.

A Okay.

Q I'm just curious, you gave an estimated street value of $24.60?

A Uh-huh.

Q Where did you get that number from?

A We have an ESV calculator on our data warehouse computer, so it's a chart and you put however many grams and it will come up with that amount.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 81

Q Okay.

A It's just a generic estimated.

Q Right. And then where do you get the .2 grams from? Where did you get that?

A .2 grams is usually one item that you buy off the street.

Q All right. And then did you review this report -- is this the report you reviewed in preparation for your deposition?

A Yes.

Q Okay. When you reviewed it did you notice if anything was incorrect or mistaken?

A Not to my knowledge.

Q Why don't you read it over again and see if you see anything that's incorrect or mistaken.

A No, I don't see anything. Nothing's wrong with the report.

Q Okay. So we'll mark this as Exhibit 1 to this deposition.

Is that your initials at the bottom left?

A Yes.

MR. FOX: Okay. Give this to the reporter.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 82

(Whereupon the document was marked Harris Exhibit No. 1 for identification as of 08/03/2011.)

BY MR. FOX:

Q And then let me just ask you a question about it. I'm going to put it back in front of you.

A Okay.

Q Under evidence recovered near the top; do you see that?

A Yes.

Q You have inventory number there?

A Yes.

Q And then is that a number that you obtained?

A No.

Q Okay. Where did you get that number?

A That's the number that's generated for who did the -- generated the inventory number for narcotics.

Q Are you the one that put that number in this report?

A Yeah.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 83

Q Okay.

A I typed it in there.

Q All right. So let me just ask you about something while we're on that.

I'm going to show you we'll mark this as Exhibit 2. This is an inventory -- what they call a property inventory report.

A Okay.

Q And do you know who filled out -- I know the copy is not as good as it could be. Do you know who filled out that report?

A Who filled out this report?

Q Yeah.

A This was computer-generated probably by Hoffman.

Q All right. So and this is for the narcotics that you recovered?

A Uh-huh.

Q That you purchased; is that correct?

A Correct.

Q All right. And so do you see this inventory number on here is different than the inventory number that you put on your report?

A Yes, I do.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 84

Q Okay. Do you know how that happened?
A Could be how it was written from that handwritten piece of paper on the sheet. It could be -- could be four mistaken for a nine or vice versa.
Q All right.
A But it clearly should be -- it should be four since it was computer-generated, so probably from the sheet that was -- that I got it from.
Q Uh-huh.
A Mistook it as a nine.
Q Uh-huh. Okay. Okay. When you do these reports, when you did this report, Exhibit 1?
A Uh-huh.
Q What other information do you have about -- do you have any other reports available to you at the time you're doing this report?
A Meaning?
Q Let me ask you this way: What's the first thing you do when you get back to the police station? After you give the baggy of narcotics to Hoffman, what was the next thing you did?
A I started generating my report.
Q And the report that we're now calling

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 85

Exhibit 1; is that right?
A Right.
Q All right. And that's the next thing you did in this case?
A Yes.
Q All right.
A And -- go ahead.
Q And then do you put -- do you -- the section where you have the inventory number here?
A Uh-huh.
Q Do you put that in at the same time you're writing the report or does that come in later, or how does that happen?
A No. As the information is given, like most of the time -- sometimes I will just start on my narrative --
Q Right.
A -- until somebody writes down all the numbers on a piece of paper and until that piece of paper is handed to me and then I can plug in the other numbers, like the inventory number and the RD number and things like that.
Q Right. And then is this report, is this all typed into a computer?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 86

A Yes.
Q And then do you have boxes that you fill in these things on, like inventory number and all of that?
A Yeah. It's like fields, different fields.
MR. FOX: Right. Okay.
So we'll call this inventory report Exhibit 2, Harris 2.
(Whereupon the document was marked Harris Exhibit No. 2 for identification as of 08/03/2011.)
BY MR. FOX:
Q By the way, did you have any contact with Reno back at the police station?
A No.
Q Did you see him back at the police station?
A No.
Q All right. And do you know that -- what money, if any, was found on him?
A No.
Q All right. And did you ever ask any

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 87

officer that was part of the team why the 1505 funds were not discovered or found or what was done to look for them?
A No. They just say they didn't find them and, you know, routine we know that they do all they can to try to locate the money, so there's no need to question behind why didn't they find it.
Q Right. And did you get any information that between the time that you gave Reno the money and the time that he was detained that he had been anywhere else other than that one store that he went into after you gave him the money?
A No.
Q Okay. Have you been an enforcement officer before on any buy-bust operation?
A No.
Q Okay. All right. So I'm going to show you -- I'm going to show you -- I just want to identify it differently.
I'm going to show you another document that's also -- we'll just identify it. We'll just give it a different exhibit number. Looks like it's got Gonzalez's signature at the bottom. It's also called the Narcotics Section Supplementary

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 88

Report. We'll call it Exhibit 3 to this deposition.

And am I correct that this is something that Officer Gonzalez wrote?

A Correct.

Q Okay. And we know that because his signature is on the bottom left of the first page?

A Yes.

Q All right. Have you ever reviewed this report?

A I probably have briefly.

Q Okay. All right. But this -- well, let me ask you about this.

It lists -- on the second page it lists the evidence officer as a PO J. Houffman, H-o-u-f-f-m-a-n. Do you know if that's the same --

A It's a typographical error.

Q It's the same Hoffman?

A Same Hoffman, yes.

MR. FOX: All right. So we'll just mark this report Exhibit 3.

(Whereupon the document was marked Harris Exhibit No. 3 for identification as of

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 89

08/03/2011.)

BY MR. FOX:

Q Okay. I'm going to show you another document which is called a Raid Activity Summary Report. We'll call this Exhibit 4.

Okay. Do you know who authored this report?

A It says Shaar.

Q Okay. Have you reviewed this report before?

A No.

Q Okay. Do you know why he wrote that there was a gang affiliation here of the Black P-Stone?

A I'm not sure. They could have possibly looked it up in a gang database or -- and his name came up with that. I'm not sure, though.

Q Okay.

A If I'm not mistaken, I believe he did have a gang tattoo on his arm.

MR. FOX: Okay. All right.

(Whereupon the document was marked Harris Exhibit No. 5 for identification as of

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 90

08/03/2011.)

BY MR. FOX:

Q Okay. I'm going to show you what we'll mark as Exhibit 5, and this appears to be some sort of log of the 1505 funds.

And can you tell me exactly what this document is?

A It's a 1505 prerecorded funds sheet.

Q And then these funds that there's a box around, these are the funds that -- the two five dollar bills that you used in this case; can you tell?

A Yes.

Q All right. And then where it says original date 9/25/2008; do you see that?

A Uh-huh.

Q What does that date refer to?

A I'm not sure.

Q Where it has person's name there's a number 209. What does that refer to?

A I'm not sure. This is something the bursar puts on these sheets.

Q Okay. Do you -- there's something that says -- there's an inventory number at the bottom,

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 91

do you see that, and then there's a K. Harris with looks like your star number at the bottom; is that right?

A Yes.

Q Do you know whose handwriting that is?

A That's mine.

Q All right. When did you -- when did you write that in there?

A I put on here 17 March, so that's probably the day that I took that money out.

Q Okay. And would this be the day that you took all the funds out that are listed on this sheet of paper?

A Yes.

MR. FOX: All right.

(Whereupon the document was marked Harris Exhibit No. 6 for identification as of 08/03/2011.)

BY MR. FOX:

Q So Exhibit 6, then, is the inventory report for the prerecorded money; is that right?

A Correct.

Q All right. And who filled out this

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 92

inventory report?
A I did.
Q All right. Next to the -- in the box where you have -- on that where it has recovered from and then you have your own name in there?
A Uh-huh.
Q And why is that?
A Because I'm the one who's generating the report. That's just boxes that has to be filled out when we do these type of reports.
Q Okay. But the money wasn't recovered at all?
A No, it's not for money. This is the fund sheet. We're not inventorying money at this point. We're just inventorying this fund sheet and it's not for these -- denomination of these bills or anything. It's just showing that we have this sheet.
Q Okay. I got you.
Because you have the -- I'm just trying to understand all this. You have the date?
A Uh-huh.
Q When did you fill this out, this exhibit?
A The fund sheet?

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 93

Q Not the fund sheet, the inventory report.
A 17 March. The date is on here. This is the date that the report is generated. The fund sheet is -- this is the same day that I take out the money you do the inventory.
Q Okay. And so this is the inventory sheet, though, that you're using for this -- you used for this case?
A Yeah. For each case we have to attach an inventory fund sheet, a prerecorded fund sheet, for each narcotics purchase that we do.
Q Uh-huh. Okay.
A And the inventory copy. We attach these two copies to each case for that month.
Q Okay. All right. I got you.
I'm going to hand you something. It's a handwritten document, and it's got a Bates stamp on it that ends in a 78.
And do you know what this document is?
A It's a contact analysis report.
Q And what does that mean?
A This -- actually someone fills this out showing the person that was arrested, all their pertinent information, and it's a brief narrative

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 94

of what happened.
Q Okay.
A And the name --
Q Go ahead. I'm sorry.
A This is just for the person that's arrested only we fill these -- these get filled out for that person. If there's an arrestee, one of those forms are filled out.
Q Okay. And here it notes that he has a tattoo of a pyramid on his arm, on his forearm?
A Uh-huh.
Q Is that something that you associate with a gang?
A Yes.
Q And then the nickname Tubbs, do you know where that came from or how that information was obtained?
A I'm not sure.
Q Was this Shaar that filled out this report?
A Yes, this is Shaar. Yes.
MR. FOX: All right. All right. So we'll call this Exhibit 7.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 95

(Whereupon the document was marked Harris Exhibit No. 7 for identification as of 08/03/2011.)

BY MR. FOX:
Q Okay. And then I'm going to show you what we'll mark as Exhibit 8. It's called a Chicago Police Department Debriefing Report.
A Okay.
Q And for the record it has a Bates stamp that ends in a 79 on the first of two pages and 80 on the second page.
Do you know who filled this report out?
A It says Shaar.
Q All right. And Hoffman?
A And Hoffman, yes.
Q All right. And then have you ever filled out a form like this?
A I have -- at some point in time I have.
Q What are they used for?
A That's when you interview the person that's been locked up.
Q Okay. And then when you interview a

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 96

person that's locked up, one of your goals is to try and perhaps get other information about other dealers and things of that nature?

A I think they're looking for -- it has a list of different things that they ask about.

Q Uh-huh. And that's the things you ask about?

A Yes.

MR. FOX: All right.

(Whereupon the document was marked Harris Exhibit No. 8 for identification as of 08/03/2011.)

BY MR. FOX:

Q And the next one will be Exhibit 9, which is the lab report.

A Uh-huh.

Q And it's got a Bates stamp of 81 on it.

When you got -- this lab report indicates an item submitted of less than .1 gram of chunky substance from one item it says. When you guys submit the evidence to the lab, do you give them all the evidence that you recovered?

A Yes.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 97

Q Okay. So do you know why it was that they have less than .1 gram and you guys said it was .2 grams?

A Well, to my knowledge, first, it could be two things. First of all, when we use our estimated chart, that's what's on that generic estimated chart. Since we're not chemists, we have that chart to go by. Once it goes to the lab, to my knowledge they test a portion of that and make sure it's positive for whatever controlled substance it is.

Q Okay. Sometimes don't they indicate, though -- when they don't test an item they indicate they have it but they didn't test it?

A Not to my knowledge. It's either negative or positive for their findings.

MR. FOX: Okay. All right. We can mark that.

(Whereupon the document was marked Harris Exhibit No. 9 for identification as of 08/03/2011.)

BY MR. FOX:

Q As far as you were concerned, though, and

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 98

your understanding was you guys would have submitted all the -- to the lab all the narcotics that you recovered?

A Yeah. It all goes to the lab, directly to the lab.

Q All right. And then I'm going to show you what we'll mark as Exhibit 10, which is -- it's called Evidence of Purchase/Official Advance Funds, and is this something that you wrote?

A Yes.

Q Okay. And you would have -- you wrote -- you would have written this on March 28th?

A Yes.

Q Okay. When would you have written this, on the same day as you wrote your other report or a different day?

A On the same day generally.

Q Okay.

A And sometimes it may be a day out. There's not a particular time. As long as you're able to account for the money that you've lost, and all we do if we don't do it that same day we refer back to the date of that report and write the information from that date on there.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 99

Q Okay. And this is just -- and the purpose of this document is what?

A To show that we lost the money that we spent. It didn't get recovered.

MR. FOX: All right. I'm going to take a break. I don't have that much more.

THE WITNESS: I'm fine.

MR. FOX: All right.

(Whereupon the document was marked Harris Exhibit No. 10 for identification as of 08/03/2011.)

(Recess.)

MR. FOX: I just have a little bit more.

THE WITNESS: Okeydoke.

BY MR. FOX:

Q At any time that day did you call dispatch for any reason in connection with Michael Reno?

A No.

Q Okay. At any time that day did you call -- did you make a LEADS inquiry in connection with him?

A No.

Q Or a CLEAR check in connection with him?

A (Witness shakes head).
Q Is that a no?
A No. No. I'm sorry.
Q All right. And then did you -- during your contact with -- your visual contact or verbal contact with Reno did you form the opinion that he was under the influence of anything?
A No.
Q Okay. And did you ever go back to that store after the arrest was made where -- the store in front of which the transaction occurred?
A No.
Q Did you ever do any follow-up investigation in connection with the arrest of Reno?
A No.
Q And then I want to show you -- look at what was marked as Exhibit 10.
A Uh-huh.
Q Again, under the inventory number you have the property inventory number. There you wrote it as 84, the last two numbers; do you see that?
A Uh-huh.

Q And on the property report -- I mean on the computer-generated report we looked up before it was 89?
A Right.
Q Do you know why it is that there was -- you had it differently on those two reports?
A You know, like I said, it could have been the way someone wrote it, whoever wrote it, it got misinterpreted, mistaken for a nine instead of a four.
Q Well, would you have gotten the report -- the inventory number from any different source for this -- for the report you wrote on Exhibit 10 as opposed to the earlier one?
A You know what? I probably would have -- at that time everything was all over. I probably -- because this is like one of the last things you do.
Q Uh-huh.
A And I probably had viewed the actual inventory report and not realized that the wrong number was on the other report, so...
Q Okay. Well, why would you look at the actual inventory report?
A The closest piece of paperwork to me.

Say, hey, what's the inventory number and somebody might hand it to me. That's the only thing I can think of as far as that.
Q But you're not sure as you sit here or you are?
A Say it again?
Q Do you actually remember looking at the actual inventory report?
A I don't recall.
Q All right. Like and, for example, where you have on this Exhibit 10 reported under raid number you have a number listed there; do you see that?
A Uh-huh.
Q The 189-09; do you see that?
A Yes.
Q Is that one of the numbers that would also be written on that scratch sheet?
A Yes.
Q All right. And then -- okay. And to your knowledge, was the 1505 funds you used to purchase drugs from Reno ever recovered at any time after that day?
A No.

Q And were you aware -- just a few more random questions here.
Were you aware of whether or not any photos were taken of Reno while he was on the street before you got there that day?
A No.
Q Were you aware of any video of him doing anything?
A No.
Q As part of -- does your team ever use photos or video to record narcotic transactions of people on the street as they're actually doing them?
A During long-term investigations. Ongoing investigations, I should say.
MR. FOX: All right. I have nothing further.
MS. BENSON: Okay. We'll reserve signature.
MR. FOX: All right. Thank you. You're done.
(Whereupon the deposition was concluded at 3:08 p.m.)

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 104

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL RENO, )
Plaintiff, )
)
vs. ) No. 10 CV 06114
)
City of Chicago Police Officer )
KEITH HARRIS, Star #19542, )
City of Chicago Police Officer )
JEROME HOFFMAN, Star #19110, )
City of Chicago Police Officer )
SHAAR, City of Chicago Police )
Officer NELSON GONZALEZ, Star )
#7235, and the CITY OF )
CHICAGO, )
Defendants. )

I, OFFICER KEITH HARRIS, state that I have read the foregoing transcript of the testimony given by me at my deposition on August 3, 2011, and

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 105

that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

__________________________
OFFICER KEITH HARRIS

No corrections (Please initial) __________
Number of errata sheets submitted ________(pgs)

SUBSCRIBED AND SWORN TO
before me this _____ day
of _______________, 2012.

______________________
NOTARY PUBLIC

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 106

STATE OF ILLINOIS )
) SS.
COUNTY OF KANE )

I, JUNE M. FUNKHOUSER, CSR, RMR, and Notary Public in and for the County of Kane, State of Illinois, do hereby certify that previous to the commencement of the examination, said witness was duly sworn by me to testify the truth; that the said deposition was taken at the time and place aforesaid; that the testimony given by said witness was reduced to writing by means of shorthand and thereafter transcribed into typewritten form; and that the foregoing is a true, correct, and complete transcript of my shorthand notes so taken as aforesaid.

I further certify that there were present at the taking of the said deposition the persons and parties as indicated on the appearance page made a part of this deposition.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 107

I further certify that this certificate applies to the original signed and certified transcripts only. I assume no responsibility for the accuracy of any reproduced copies not made under my control or direction.

IN TESTIMONY WHEREOF I have hereunto set my hand and affixed my notarial seal this 14th day of January, 2012.

June M. Funkhouser, CSR, RMR
Illinois CSR No. 084-003024

My Commission Expires
November 1, 2013.



Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Page 108

Errata Sheet

NAME OF CASE: Reno vs. City of Chicago

DATE OF DEPOSITION: 08/03/2011

NAME OF WITNESS: Officer Keith Harris

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ____________________ to ____________________

Page _____ Line ______ Reason ______
From ____________________ to ____________________

Page _____ Line ______ Reason ______
From ____________________ to ____________________

Page _____ Line ______ Reason ______
From ____________________ to ____________________

Page _____ Line ______ Reason ______
From ____________________ to ____________________

Page _____ Line ______ Reason ______
From ____________________ to ____________________

Page _____ Line ______ Reason ______
From ____________________ to ____________________

____________________

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: background..day

44:3,8 59:12 60:23 71:13 72:21 82:7 84:20 86:16,18 98:23 100:9
background 8:8
bad 36:23 80:9
bag 55:1,4,7,9,10 56:8 59:9
baggy 58:17 60:9, 13,18 73:1 84:21
bags 54:24
based 59:1 77:17
Basically 17:11
batch 22:20
Bates 93:17 95:10 96:18
BENSON 20:18 21:23 25:9 103:17
big 26 11 36:19
bills 62:21 66:3 90:11 92:16
birth 10:3
bit 70:20,21 99:14
black 47:17,18,20 49:15,16 89:13
blacked 80:1
blocks 63:6
bottom 80:12 81:20 87:23 88:7 90:24 91:2
bought 44:9 64:21
box 90:9 92:3
boxes 86:2 92:9
break 6:5 99:6
briefly 88:11
bring 68:1
brought 67:6,11, 15
bulges 57:21
bursar 90:22
Butler 15:23,24
buy 17:10 20:16, 17 21:11,13 23:8 25:14 26:22,23 27:2 38:21 39:6,7, 8,11 40:1,2,11 41:10,18 42:3,19, 23 43:9,20 44:14 45:17 64:15 65:12 67:18 68:16 69:20 81:5
buy-bust 33:5,11, 15, 38:20 40:22 43 13 87:15
buys 20:8,10 23:1 39:12,16

C

calculator 80:21
call 10:15 40:23 44:21 74:8 83:7 86:8 88:1 89:5 94:23 99:17,21
called 5:4 10:7 42:14 49:3 78:23 87:24 89:4 95:7 98:8
calling 42:15 84:24
capacity 29:11,14
car 48:11 50:22 61:16,19,22 63:2 68:22
care 18:18
career 23:22
cars 41:2,4,5
case 21:16,17 23:7 25:17,21 26:3 43:8, 50:12 63:9 64:20 68:5 70:1,2 74:13,22 75:5,10 85:4 90:11 93:8,9, 14
cases 23 22 24 2 32:18
cease 16:5
cell 27:18,20,24
cellular 51:11
chart 80:22 97:6,7, 8
check 99:24
chemists 97:7
Chicago 7:19 9:11 95:8
chips 57 2
choose 12:3,4
chose 13:22
chosen 11:5,6
chronology 56:2
chunky 96:21
citizens 71:9
Civil 5:16
clarification 44:23
clarify 65:20
clear 6:16 28:8 80:7 99:24
close 22:13,14 45:22 48:16
closest 101:24
clothing 47:10,15 49:12,13,14 57:21
clue 78:17
coat 49:15
cocaine 17.10 52:14 58:17,20
college 9:23
communicate 27:8,17
communication 27:13 69:1
communications 27:15 45:22
competition 28:22
complaints 37.24 38:2,6
complete 48:9
comprise 10:21
comprised 24.5
computer 80:22 85:24
computer-generated 74:8,18 75:15,16 83:14 84:8 101:2
concerned 97:24
concluded 103:22
conducting 40:22
confirm 65:17
confirmation 44:17
connection 7:8 25:7 28:24 72:2 99:18,21,24 100:14
consisted 55:21 56:11
consistently 12:22
consists 11:21
constant 65:4
contact 50:18 58:6 66:15 93:20 100:5,6
contained 55:1
controlled 97:10
convenience 56.23
convenient 18:6
conversation 53:2,20 55:15 59:5 61:6,10 63:19 71 5,15,19 72:1
conversations 65.5
copies 93:14
copy 73:19,21 80:9 83:10 93:13
corner 46:22 48:16 49:6,21 51:4,5,8,15,16,18
53:8,17,20,23 56:19,20 62:4,5,6
correct 19:17 21:2,3 25:8,14,18, 26:19 29:9 30:14 34:2 42:19,20 50:15,16,22 58:2 59:9,10 60:11 65:21,23 79:10,11 83:19,20 88:3,5 91:23
correctly 65:11
court 23:23
cover 69:4
crimes 29:19,20
criminal 7:2 8:10 21:16 23:22 60:7
crossing 53:14
curiosity 28:20
curious 80:17
current 8:13
custody 64:7 66:24

D

Darwin 15:23
data 80:21
database 89:16
date 10:3 11:5 15:16 40:20 90:15, 17 92:21 93:2,3 98:23,24
day 10:14 11:2,10 12:9 17:20,22 23:12,15,17 24:4, 16,19,24 29:4 30:13,20 31:3,14, 16 32:3,8 33:22 34:3,9,19,23 35.1, 2,3,12,19,20,23,24 36:5 37:7 38:3,6, 17 39:2,5 40:6 41:7,10,19 46:7,8 48:15 51:3,21 54:6,14 71:15 72:11 76:17,21

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: $10..back

$

$10 55 10,20 56:2, 8,10 59:1
$24,60 80:18

0

024 79 14
05 71:21
08/03/2011 82:4 86:13 90:1 91:19 95 4 96:13 97:22 99:12
09 8:23 9:4 18:3 38:14 40:20 46:7

1

1 9:1 81:18 82:2 84:13 85:1 96:20 97:2
10 98:7 99:10 100:18 101:12 102:11
11 64:18 66:8,17
11th 15:4
15 7:22 64:18 66:8, 17 67:20
1505 19:14,23 20:4,10 21:1,5,15, 19 22:6,11,23 23:3,11 54:5,8 71:17 87:1 90:5,8 102:21
1648 79:9
17 91:9 93:2
189-09 102:15

2

2 8:20,23 9:8 14:24 30:7 34:21 36:15, 19 65:6,7 70:3,7,9, 10,17 81 3,5 83:6 86:9,11 97:3
2000 16:7
2009 14:14,16 16 8
209 90:20
28th 35:13,21 38:14 40:20 46:7 98:12

3

3 88:1,21,23
39 10:4
3:08 103:22

4

4 89:5
45 50:20
4:00 46:10
4:48 79:9

5

5 89:23 90:4
50 33:2,3
5:00 35:9

6

6 91:17,21

7

7 94:23 95:2
78 93:18
78th 37:3
79 95:11
79th 34:10,11,18 37:4,9 38:10,15 46:9 48:17,22 53:11,14,15,17,24 56:19,20 62:4

8

8 95:7 96:11
80 95:11
81 96:18
84 100:22
89 101:3

9

9 96,15 97:20
9/25/2008 90:15
98 15 12
99 9:5 14:9,11 15:12
9:00 35:8

A

ability 5:22
academy 13 18, 21 14:4,17
account 98:21
action 52:6
activity 17:16,17, 20 29:8 37:21 60:7 77:14 89:4
activity-wise 28:20
actual 42:19 67:3 101:19,23 102:8
added 66:1
addition 42:8
additional 76:8
address 36:21,24 37:3
advance 41:13 98:8
affiliation 79:18 89:13
African-american 39:19 47:12
afternoon 46:12, 13
age 10:3
agencies 9 12
ahead 20:20 21:24 26:10 78:3 85:7 94:4
amount 18:14 22:12 80:24
analysis 93:20
announce 67.10
answers 7.23 8:2
appearance 57:12,16
appeared 47.4
appears 90:4
applicable 5:15
application 15 10,12 16:20,21
applied 30:2,4
apply 5:24
approach 48:7
approached 52:5, 9 57:19
approximate 14:22
approximately 7:22 13:18 59 17
area 8.20,23 9:1,8 10:15 11:13 14:24 17:9,17 18:13 30:5,7 34:14,21 36:12,13,15,18,19 37:16,18,20,24 38:10,14 39:9 40:24 41:10,21 42:2,3 44:4,9 45:6, 18 46:9 61:23 62:24 63:1 64:5 67:17,19 70:3,7,9, 10,17
areas 9:1 10:16,18 11 10,11, 17:15
arm 89:20 94 10
arrest 7:8,15 9:6 12:24 15:15,16,22 19:4,6 21 9,21 23 7,12 24:23,24 25:2,4,8 28:11,12
30:13,21 31:3,14 32:3,9,10,14 33:15,21 34:4,9 37.8 71:5 76:18 77:3,7,8,12,14,18 78:1,3,12,13 100:10,14
arrested 23:12 24:5,20 93 23 94.6
arrestee 94:7
arrests 28:3,8,15, 24 29:4 32:20 34:16,17 76:21
assign 17:15 40:6
assigned 12 1 15 4 17:7,9,14 18:4 22:9 34 24 36:5,12,14,16,18 40:14,17 74:7,16 76:11,12
assignment 8:14, 22 15:3 39:5
assignments 39:4
assigns 36:8 74:5
associate 94:12
attach 93:9,13
attempt 39:8
attested 77:19
attesting 77:20
attorney 7:14
audibly 6:9
authored 79:3 89:6
average 18 5
aware 7:7 103:1,3, 7

B

B-u-t-l-e-r 15:24
B5 13:7
back 9:5 13:19 18:3 21:13, 22:15 25:1 33:7,11 34:1

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: days..gave

91:10,11 93:4 98:15,16,17,19,22 99:17,20 102:23 103:5
days 23:15 35:4, 11
dealers 50:6 96:3
Debriefing 95:8
Defendants 5:4
denomination 92:16
department 9:11 15:5 16:17 19:2 20:12 95:8
department-issued 27:20
depending 11:23 18:15 24:2 42:12
depends 11:7 12:2 18:8,10 23:16 40:3 69:21,22
deposition 5:13, 16 6:20 81:9,19 88:2 103:21
describe 47:8 62:10,13,16
describes 44:13
description 38:3 45:4,13,18 46:21 47 11,15 49:10,12, 13,14 57:18 62:1 64:21,24 65:8
descriptions 38:7
designate 17:19
designated 11:2
designations 26:24
details 48:3,4
detain 43:9 44:8 64:5 65:3 66:13, 15,22
detained 45:5,9 71:11 87:10
detainment 44:10 45:6,12 67:17
detention 67:3 71:10 72:12
dialogue 59:7
differently 87:19 101:6
DIRECT 5:7
direction 47:24 62:8
directly 70:7 98:4
discharge 9:19
discovered 87:2
discuss 66:6
discussed 71:16
dispatch 99:17
disseminate 74:11
distinctive 63:7
distinctively 47:19 62:7
distribute 22:6
district 8:16,19 15:4 16:10 30:5
document 43:3 78:22 82:1 86:10 87:20 88:22 89:4, 22 90:7 91:18 93:17,19 95:1 96:10 97:19 99:2,9
dollar 62:21 66:2 90:11
dressed 51:2
drive 45:2,5 48:14 64:8 67:16 68:3, 20,21 69:6,14
drive-by 67:22
driving 47:24
drove 48:16 61:23 68:19 71:7
drugs 102:22
duly 5:2,5

E

earlier 35:10 101:13
east 34:10 37:13
education 9:22
effect 29:3 50:8
encounter 34:5
end 22:12 52:2
ends 93:18 95:11
enforcement 25:24 26:18 27:1 38:22 39:5 40:14 42:10,12,13 43:6, 44:7,14 45:4,12 48:2,8 63:14 64:5, 6,7,11,16,24 65:1, 2,4 66:3,5,11,15, 22,23 67:4,13,14, 15 68:1 69:2 87:14
entire 53:2 59:24 73:1
envelope 72:23 73:6,9,10
error 88:17
Essex 34:11,18 37:9 38:10,15 46:9 48:17,18,20,22 53:13,17,24 56:20 62:4
estimated 80:17 81:2 97:6,7
ESV 80:21
evasive 52:6
evening 46:11
event 10:12 18:2 26:11 30:23 69:17 76:5
events 27:5
evidence 21:16 72:8,10 75:4,6,8,9 82:10 88:15 96:22, 23 98:8
exact 37:3
examination 5:5, 7
examined 5:6
exchange 55:18 60:6
exhibit 81:18 82:2 83:6 84:13 85:1 86:9,11 87:22 88:1,21,23 89:5,23 90:4 91:17,21 94:23 95:2,7 96:11,15 97:20 98:7 99:10 100:18 101:12 102:11
explain 20:9

F

fact 19:20
fair 57:9
familiar 34:13
Federal 5:15
feel 6:2,7
fields 86:5,6
fill 70:13 86:2 92:23 94:6
filled 15:10,12 16:19 83:9,11,12 91:24 92:9 94:6,8, 19 95:13,18
filling 16:20
fills 93:22
final 44:16,23
find 20:15 71:17, 20,21 87:4,7
findings 97:16
fine 99:7
finish 76:24
fives 54:11 55:21 56:11
focus 29:8,23
folks 25:7 27:6,7 28:4 30:9 40:7
follow 52:19 53:4
follow-up 100:13
food 57:1
foot 59:19,24 60:3
force 10:7,19,21, 22 11:5 12:8
forearm 94:10
forgot 45:14
form 25:9 95:19 100:6
forms 94:8
found 72:2 86:22 87:2
foundation 20:19 21:23
FOX 5:8,12,19 6:12,18 20:23 22:1 25:12 81:23 82:5 86:7,14 88:20 89:2,21 90:2 91:15,20 94:22 95:5 96:9,14 97:17,23 99:5,8, 14,16 103:15,19
free 6:2,7
front 82:7 100:11
fund 92:13,15,24 93:1,3,10
funds 19:14,16,20, 23 20:4,10,15 21:1,2,5,8,15,19, 20 22:6,8,11,15, 20,24 23:3,4,11 54:5,8 71:17 87:2 90:5,8,9,10 91:12 98:8 102:21

G

game 43:16
gang 79:16,18 89:13,16,20 94:13
gave 37:6 46:20 47:10,16 55:20,23 56:2,10 58:1 60:9, 18 61:24 62:2

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: generally..LEADS

64 23 72:24 75 10 80:17 87:9,12
generally 24:16 30:7 55:2,5,10 56:7 78:11 98:17
generate 77:15
generated 75:18 82:19,20 93:3
generating 84:23 92:8
generic 81:2 97:6
generically 43:11 44:2 74.4
get all 73:16 74:9
give 11:10 32:23 36:24 37.2,12 45:3,11,13,18 46:19 49:10 54:2 64:21 65:19 66:21 81:23 84:21 96:22
giveaway 50:11
giving 62:19
goal 17:10 21:20
goals 96:1
Gonzalez 25:20 26:13 31:2 41:8,12 46.24 56:16 70:24 88:4
Gonzalez's 87:23
good 83:10
gram 55:4 96:20 97:2
grams 55.6,7 80:23 81:4,5 97:3
guess 40:3 53:1 74 5
guy 39:20,21 40:11 43:18 44:11, 12,13 45:7,9,12, 47:13 64:21 66:22, 24 68:2,16 69:10
guys 12:16,17 41:1 44:23 67:4 76:14 96:22 97:2 98:1
guys' 11:8

H

H-a-r-r-i-s 5:11
H-o-u-f-f-m-a-n 88:16
half 7:22
hand 39:4 47:3,4 93:16 102:2
hand-to-hand 47:4
handcuffed 68:13
handed 58:14 72:22 85:20
handing 62:17
hands 59:8
handwrite 74:10
handwriting 80:4 91 5
handwritten 73:23,24 84:3 93:17
handwrote 79:23
happen 15:8 43:13,19,24 56:6 85:13
happened 13:1 53:5,24 56,11,12 58:13 61:24 62:14 63:13 65:17 66:4 94:1
hard 33:13
Harris 5:3,11,13 82:2 86:9,11 89:23 91:1,17 95:2 96:11 97 20 99:10
he'll 43:16 44:21
head 6:9 100:1
hear 6:3 38:1 45:23 50:2,12 61:1,3,6 64:10 66:5,8,14,21
heard 64 2,15 67:7
hears 66:5
held 71:10
hey 11:9 42:1 43:17 44:10,23 45:7 76:13 78:2 102.1
high 10:15
high-traffic 37:18, 20
higher 17:3
highest 9:21
Hoffman 26:5,17 30:10 32:5 41:9 70:17 71:4,14 72:10,12,22,24 73:5 75:4 83:15 84:22 88:18,19 95:16,17
honorable 9:18
hooded 47:18
hot 10:15 11:1,11, 14 17:9 18:16
Houffman 88:15
Hughes 77:21 78:15
hundred 78:9

I

identification 67:23 71:8 82:3 86:12 89:24 91.18 95:3 96:12 97:21 99:11
identify 64:8 67:17 87:19,21
illegal 11:12
incident 70:3 73:21
incidents 33.6,10
included 41:8
incorrect 81:12, 15
indicating 79:21, 22
individual 20:16 28:23 45:5 48:7
individuals 46:22 47:6 49:22
influence 100:7
info 43:22
inform 11:9
information 46:15,17,19 47:21 78:7 84:15 85 14 87:8 93:24 94:16 96:2 98:24
informing 10:13
initials 81:20
inquiry 99:21
inside 56:13,18 57:3 61:7 67:5,6, 11,13
instruct 64:16 67:22
instructions 69:15
interpretation 65:19
interrogatories 7 24 8:2,7
intersection 34 18 41:13 46:15, 16 48:12 49:1
interview 16:23 95:22,24
interviewed 16:24
inventory 73:10, 12,14 74:13,17 75:11,13,15 76:7,8 82:13,20 83:6,7, 22,23 85:9,21 86:3,8 90:24 91:21 93:1,5,6,10,13 100:20,21 101:11, 20,23 102:1,8
inventorying 72:6 92 14,15
investigating 29:19
investigation 33:8,18 79:23 100.14
investigations 103:13,14
involved 7:15 25:8 26:9 27:3 29:19 78:12
involvement 77:15
item 58:15 81:5 96:20,21 97:13

J

jacket 47:17
jeans 49:16
job 38:20

K

Keith 5.3,11
kind 42:14 51:6,9 56 22 62:9
knew 30:24 31:23 35:22 41:9,20 79:17
knotted 58:15
knowledge 11:4 22:23 27:14,23 28:22 30:17 31:21 32:6 34:4 47:7 71:12 81:13 97:4, 9,15 102:21

L

lab 96:16,19,22 97:8 98:2,4,5
label 26:13
labeled 25:24 26:19,20
law 5:23
leader 15:17
LEADS 99:21

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: offender..recollection

offender 21:7
offenders 79:13
office 74:4
officer 5:3,11,13 7.19 8:15 23:8 26:14,16,22,23 38.21 39:5,6 40:1 42:9,22,23,24 43:20 44:15,19 45:14,20 46:18 65.6,13,15 72:8, 11,14 75:4 77 21, 24 87:1,15 88:4,15
officer's 70:15 80:2
officers 7:15 11:22 25:24 26:18 27:1,2 28:23 29:2 39:7,8,11,12,13 40 15 42:10 43:6 44:14 64:16 66:3 69:2 75:9 78:12
Okeydoke 99:15
ongoing 33:7,17 103:13
operation 33:15 43:14 87:15
operations 38:21
opinion 100:8
opposed 19:5,10 39:13,20 58:22 101:13
orange 47:19
order 20 16 65.10
orders 66 21
ordinary 57:22
original 90:15
overhear 67:2
owners 38:9,14

P

P-stone 89:14
p.m. 79:10 103:22
pages 77.9 95.11
paid 61 2 66.1
pants 47:18,20
paper 73:18 74:1, 10,19 75:22 84:3 85:19,20 91:13
paperwork 19:8, 14 23:4 25:1 69:22 70:5,12,13 73:20 76:1 101:24
park 47:24 69:14
parked 48:21
part 17:21 20:14 26:11 28:2 30:12 87:1 103:10
passed 10:12
passing 46:22
past 44:10 45:5 64 8
Patrol 15:6
pay 59:1
penalties 5:24
people 24:5,8 27:1 62:20 74:24 103:12
percent 33:3 78:9
percentage 32:23 33:13
period 12:18,20 28:16 70:8
perjury 5:24
person 25:14,16, 17 38:2 43:9,21 45:19 49:7 64:9 76:10 78:6 93:23 94:5,7 95:22 96:1
person's 90:19
persons 10:20 24:7 26:2 38:6
pertinent 93:24
phone 27:10,12, 18,21,24
phones 27.10
photos 103:4,11
pick 18:14,17
piece 74:19 75:22 84:3 85:19 101:24
place 73:5 79:9
places 73:8
plain 41:4
Plainclothes 50:24 51:1
Plaintiff 5:5
plastic 58:15 59:9
play 26:10
players 43.16
plug 85:20
PO 88:15
pocket 60:14,16
point 44:6 46:3 48:2 53:8 55:16,19 65:22 66:12,24 67:14 73:13 92:14 95:20
pointed 48:8
pointing 79:21
police 7:19 8:8,15 9:11,12 15:4 16:17 72:21 84:20 86:16, 18 95:8
portion 97:9
positions 27:4
positive 44:24 97:10,16
positively 64 8 67:17
possession 72:17
possibility 18:23
possibly 37 14 51:13 70:23 89:15
powder 58:22
preface 20:24
preparation 6:19 81:9
prerecorded 90:8 91:22 93:10
presence 7.13
present 40:4
pretty 20:12 27:4 29:23 40:8 42:11 65:23
primary 29:8
prior 14:17 30:22 38:14
Procedure 5.15
process 16:21,23 45:21 70:3,4
processing 69:16
promotions 30:2
property 83:7 100:21 101:1
prove 20:15,17 21:10,12
provided 73:12,15
pull 78:5
pulled 78:2
purchase 10:17 43:24 44:2,3 56:9 80:3 93:11 102:22
Purchase/official 98:8
purchased 83:19
purchases 11:12
purchasing 6:21 70:15 77:16 79:24 80:2,5
purpose 20:9,11, 15 28:18 99:2
pursuant 5:14
put 31:9 60:14 73:17 76:2,4 80:22 82:7,22 83:23 85:8,11 91:9
puts 90:22
pyramid 94:10

Q

qualification 39:24
question 6.1,2,6, 13,15 8:1 20:22 36:23 82:6 87:7
questions 5:21 6:8 8:2,6,7 63:22 103:2

R

radio 27:12,14 42:5 43:17 44:5 46:3,24 48 1, 58:6 62:14 63:13,21 64:11 65:5,12 66:15 67:3,8 69:7
radioed 61:24
raid 89.4 102:11
raining 51:23
random 103:2
rank 8:13
rate 31:18 35:21
reached 42.15
read 19:13 81:14
reading 10:6
realized 101:20
reason 6:6 99:18
reasons 43:1
recall 11:23 31:17 32:2,7,11,12,16 34:17 37:6 51:3,22 54:10 57:23 59:22, 23 60:16 71:2,24 74:23 76:22 102:9
received 60:2 73:3
Recess 99:13
reclarifying 46.4
recognize 78:18
recollection 76:20

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: learn..OEMC

learn 35:1,3,17
learned 49:8 50:5
leave 45:17 65:11, 12
leaving 62:24
left 13:3,18,20 63:1 80:12 81:21 88:7
letter 13:7
level 9:21
light 52:3
likewise 6:14
list 36:9 96.5
listed 102:12
listen 42:13
listens 66:5
lists 88:14,15
locate 21:6,20 87:6
location 36:6,8,16 40:24 43:21 45:4 46:23 53:7 56:14 61:13 62:1,2 63:7, 17,18 64:1,3,8,17 68:9 69:16,19
locations 36:10
locked 95:23 96:1
log 90:5
long 8:21 9:2 13:13 14:8 28 11 50:17 58:9 64:1,14 67:15,18 98:20
long-term 103:13
longer 16:12 59:15,17
looked 57:18,21 58:16,19 89:16 101:2
lost 98:21 99:3
lot 11:15 18:17 37 21,24 42:11 50:9,10

M

made 21:21 28:8, 15 34:16 43:10 44:2,15 45 12 49:17 50:18 68:16 71:7 76:20 100 10
maintain 69.4
major 9:24
make 6:8 11 12 17:10 19:5 24:23 25:2 28:4,24 32:9, 19 33:21 39:8 41:10,18 44:23 45.17 56:1 65:11 67:22 97 9 99:21
making 34 17 48:7
male 46:20 47:5,8, 9 49:14
March 18:3 35:13, 21 38:14 40:20 46:7 52:2 91:9 93:2 98:12
mark 21:16 77:1 81:18 83:5 88:20 90:4 95:7 97:17 98:7
marked 32:19 82:2 86:11 89:23 91:17 95:2 96:11 97:20 99:10 100:18
matching 38:2
matter 53:2 70:22 78:6
Meaning 84 18
means 22:15 33:20 70:4
meant 54:17
meeting 40:21
member 9:11 10:9 63:19
members 11:4 12:12,19 13:2,10 27:24 31:10 40:18, 20 41:7 44:5 61:24 65:18
mention 17:15
mentioned 8:4 67:12
met 31.16
Michael 7 8,16 13:1 49:8 99:18
middle 6:8 16 7
military 9:14,16
mine 91:6
minute 54:4 58:11,12 59:15,18, 20 61:19
minutes 64:19 66:8,18 67 14,20 70:22
misinterpreted 101:9
mission 12:9 17:22 19:5,7,10,11 20:5, 21:7 22:2 24:4,9 27:3,7 30:13,20 31:11 32:9 33:8 35:1,15, 23 43:13 76:6
missions 17:23, 24 24:19,22 32:13
mistaken 17:5 81:12,15 84:4 89:15 101:9
Mistook 84 11
moment 66:12
money 21:13,14 22.17 32:19,21 33:7,11 34:1 54:3, 8 55 18 56:13 57:17 62:18 71:20 76:8 86:22 87:6,9, 12 91:10,22 92:11, 13,14 93:5 98:21 99:3
month 18:5,7,21 22 8,10,12,13,17, 19,21 23:24 24:1,2 28:4 29:5 93:14
Mornings 35:6
moved 64:3

N

names 38:7
narcotic 10 16 11:12,16 16:13 20:8,10 54:20 60:4 103:11
narcotics 6:21 8:17 9:3,4,7 10:18 13:10,18 14:8,9, 18,24 15:2,9 16 22 28:2 29:7,8,14,20, 23 30:1,16 37:21 42:3 43:22 44:21 50:6 54 24 56:8 57:9 59:6,8 60:2 62:19 64:9,22 66:2 70:15 72:3,7,16,23 75:7,9,11 76:7 78.23 79:21,22 82:21 83:17 84:21 87:24 93,11 98 2
narrative 85:16 93:24
nature 44:24 95:3
Navy 9:17
necessarily 21:12 34:15 39:22 57:10 77:23
negative 97:16
neighborhoods 39 19
Nextel 27 9,21 45:3,6
nickname 94:15
nods 6:9
north 37.13
north-south 48:18
northbound 49:4
northwest 51:5, 14,16,18
note 22:18
notes 94 9
Nothing's 81:16
notice 5:14 57:11, 15 81:12
number 13:7 17:22,24 18:1 19:17,21 20:1 21:2 28 3 29:4 73:10, 12,14 75:19 76:5,6 80:20 82:13,15,18, 19,20, 83:22,23 85:9,21,22 86:3 87:22 90:20,24 91:2 100:20,21 101:11,21 102:1, 12
number's 75:18
numbers 22:18 27:11,12 73:16,19 74:2,5,7,9,13,16, 17,24 75:22 76:2, 3,4,7,13,14 85:19, 21 100:22 102:17

O

oath 5 22,23
object 20:18 21:23 25:9
obliged 14:6
observations 59:2
observe 49 1,18 50:17 68:7,21
observed 47:3 49:2 68:8,14
observing 47:5
obtained 82:16 94 17
occasion 20:6 28:14
occasions 23:14 32:20 69 18
occurred 100 11
occurrence 79:9
OEMC 74:8

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: record..substance

record 5:10,12 19:16,21 54:13 95:10 103:11
recorded 20:12 27:15
recover 32:21
recovered 22:24 82:10 83:17 92:4, 11 96:23 98:3 99:4 102:22
reemerged 58:14
refer 90:17,20 98:22
referenced 11:18
referring 8.3 11:19 12:8
refreshed 76:19
regular 60:3
related 79:16
relation 79:14,15
relocate 70:3
remember 17:1 24:6 32:4 37:10 46:7 47.15 51:6, 11,21,24 63:8 76:19 102:7
Reno 7:8,16 9:7 13:1 15:16,22 23:7,12 24:5,17,20 25:7,17 33:15 49:8 51:4 57:7 60:6,17 61:1,2,10 67:3 68.11,12 71.10 73:3 86:16 87:9 99:18 100:6,15 102:22 103:4
Reno's 30:13,21 31:3,14 32:3,8,14 34:3 37:7 38:2
repeat 6:3,4
rephrase 6:3,4
report 6:21 18:2 28:11,12 70:16 77:4,7,8,12,16,18 78:1,13,23 80:2 81:6,17 82:23 83:7,11,12,23 84:13,17,23,24 85:12,23 86:8 88 1,10,21 89:5,7, 9 91:22 92:1,9 93:1,3, 94:20 95:8, 13 96:16,19 98:15, 23 101:1,2,10,12, 20,21,23 102:8
reported 102:11
reporter 81:24
reporting 19:3
reports 7:7,10 10:6 73:17 76:16 78:5 84:13,16 92:10 101:6
reserve 103.17
respond 52:18
responsible 72:5, 6
retrain 13:21
return 22:15
review 6:20 7:10, 23 81:7
reviewed 81:8,11 89:9
rock 58:19,23
rocks 50:3,7 52:13
role 26:13 40:9,23 42:18,21 43:5
roles 38:22 40:6, 14,16 42:18
roll 41:1
roughly 12:12,13 16:6 18:20 23.14, 22 32:24 35:8 58:12 64:17 66:8, 17 67:18
routine 29:16 87:5
routinely 39:12,16
Rules 5,15

S

safe 64 5
safety 43:1,2,7
sales 54:20 60:4
scratch 73:18 74:1 75:22 76:3 102:18
seconds 50:20 53:2
section 79:23 85:9 87:24
sees 44:20
sell 43:23
send 43:23 44:7
sergeant 11:8 15:23 16:3,6 17:3, 4 36:9 39:3 44:6 64:4,11,15,20,23 66:14,21
sergeants 17:5
serial 19:17,21 21,2 22:18
series 5:21
set 42:2
Shaar 26:6,17 31:5,6,7,13 41:9 70:18 71 4,14 89:8 94:19,21 95:15
shakes 100:1
sheet 73:18 75:13, 20 84:3,9 90:8 91:13 92:14,15,18, 24 93:1,4,7,10 102:18
sheets 90:22
shirt 49:15
shortly 70:19
shouting 50:1
show 28:11 76:24 77:2,3 78:21,22 83:5 87 17,18,20 90:3 98:6 99:3 100:17
showing 92:17 93:23
shut 48:1,6
sight 44:8
sign 22:8,11
signature 80:12 87:23 88:7 103:18
sir 9:13,15 26:1 29 8 32:17 34:6
sit 102 4
situations 33:24
skullcap 47:17 49:15
slang 52:14 54:19
small 58:15
snowing 51:23
soda 57:2
sold 64:9
sort 30:20 90:4
source 101:11
south 37:13 48:17, 21 55:24
southbound 53:6,9,12,13 60:24 61:13
southwest 53:8, 17,20,23 56:20 62:5
speak 10:23 43:16
speaking 44:2 78:11
specific 38:1,5
specifically 62:20
spell 5:10
spent 99:4
spoke 74:20
spot 17:9 44:19
spots 10:15 11:1, 11,14 18:16
stamp 93:17 95:10 96:18
stand 20:1 50:6 79:14
standing 49:5,20, 21 51:8 57:4 68:8
star 91:2
start 22:3,20 36:10 57:14 85:15
started 70:12 84:23
state 5:9
stated 49:14
station 71:14 84 21 86:16,19
stayed 60:20
stitching 47.19
stop 68:20
stopped 70:8
store 38:9,13 51:6, 7,9,12 53:7 56:14, 19,22,24 57:3 58:1,5, 59:14,20 60:21 61:2,4,7 62:10,18 67 6,11, 13 87:11 100:10
street 37:4,10,12 48:17,18 49:4,5 52:14 53:6,10,11, 14 54:19 60:21 80:18 81:6 103:5, 12
streets 50:6
strike 10:7,19,21 11:5,9 12:8 17:7, 20,24 18:5,15 19:5,6,10,11 20:5, 7 24:4,9,19,22 27 3,7 30.13 31:11 32:9,13 35:1,14,23 40:18,21 43:13
stuff 57:1
subject 49:3 64:6, 7 67 13,16 68:8,10
submit 96:22
submitted 96:20 98:2
subsequent 23:1
substance 96:21 97:11

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: Summary..working

Summary 89:4

summer 16:8

supervisor 14:3 15 19,21 17:1,2 19:9 28:6 29:2 39:3 64 4 69:23 70:2

supervisors 10:13

Supplementary 78.23 87:24

supposed 64:12

surgical 10:7,19, 21 11:4,9 12:8 17:7,20,24 18:4,15 19:5,6,10,11 20:5, 6 24:3,9,19,22 27:3,7 30:12 31:10 32:9,13 34.24 35:14,23 40:18,21 43:13

surveillance 26:14,16 27:2 38:23,24 39:6 40:15 42:1,9,21,23 44:15,19 45:14,19, 22 46:3,18 48:2,9, 11 49:3 65:6,13,15 67:12

suspicious 52:7

sweatshirt 47:18

sworn 5:2,6

system 28:6 78:1

T

talk 7:13,14 38:13 40:19 43:21 47:5 51:18 54:4

talked 38 12,13 52:9 76:18

talking 11:15 48:21 49:22,24 57:6,12 68:11

target 11:11

targeted 10:16 17:15 18:16

tattoo 89:20 94:10

team 10:20 11:6,7, 18,20,21,24 12:2, 6,11,17,19,21,23, 24 13:2,3,5,6,9,12, 14,16 14:10,11,14, 15,24 15:14,16,17, 19,21 18:8,11,18, 19 24:8,13 27:24 30:10,11,17 31:3, 8,10,20,22,23 32:5,9 35:18 40:19,21 41:8 44:5 45:23 61:24 63 14, 19 65:16 66:22 74:12 76:6 78:19 87:1 103:10

teams 10:23 11:7 12:1,2 14:18,19,22 18:12,13,14,17 24:10,11,13 28.23 42:12

telling 65:16

tells 64:4

tenth 55:4

test 97:9,13,14

testified 5:6 23:21

testimony 25:6

thing 6:4 10:7 33:14 52:16 53:5 56:12 84:20,22 85:3 102:2

things 6:10 14:3 29.15 43:1 44:20 50:7 73:9 79:7 85:22 96:3,5,6 97:5 101:17

tickets 29.15,16

till 77:1

time 9:6 11:24 12:18,20 15:22 16:11 21:9 28:16 33:3 34:18 44:6 45:24 46:3,8 50:19 54:2 56:15 57:13, 59:16,24 60:1,5 63:11,12 64:14,15 65:8,22 70:8 71.14 72:23 79:8 84:17 85:11,15 87:9,10 98:20 99:17,20 101:15 102:22

times 10:24 11:19 18:8,21 23.23 24:1

today 6:20

told 37:7 46.3 47:23 56:2 61:9 64:2

top 49:15 82:10

tossed 75:24

touch 77:11

tracing 23:4

track 28:3

traffic 29:15,16 59:19,24 60:3

trafficking 10:16

training 13:17,23 14:4,17

transaction 25:18 44:21 100:11

transactions 11:16 47:5 103:11

transcript 7:1,2 8:4,11

transfer 16:9

trial 7 2 8:11

Tubbs 94:15

turn 10:24 11:8

turned 60:10

type 10:12 27:5 56:14,23 92:10

typed 83:2 85:24

types 78:6

typewritten 73:22

typical 54:19 58:17,24

typographical 88:17

U

Uh-huh 44:18

unable 32:21

undercover 23:8 26:21 29:11 41:4

understand 6:1,2 17:6 42:17 56:1 65:10 92:21

understanding 37:20 63:12,13 77:17 98:1

understood 25:6 54:17

unique 19:19

unit 8:17 9:3,7 12:17 13.10 14:8, 24 15:3,9 16:12, 13,22 17.2,8 28:3 29:7,14,21 30:2 56:8 74 15,21 75:17 78:4 80:19 83:18 84:10,12,14 85:10 90:16 92:6, 22 93:12 94:11 96:6,17 100:19,24 101:18 102:14

unmarked 50:22

unusual 31:9,11, 57:12,15,20

utilize 18:19 24:10

V

varies 12:15

vehicle 44 4 46:2 47:24 48:3,5,7 49:2 50:20 59 13

verbal 49:17 50 18 69:1 100:5

versa 84:5

versus 39:6

vice 84:4

vicinity 34:10 37 2,3,6 41:20 71:9

video 103:7,11

viewed 67:1 101:19

visual 100:5

visually 45:8

W

wait 6:12,14 41:23, 24 42:1 58 10 64:1 66:23 69:15

waited 56:14 58:5 66:7

waiting 59:21 61:7 63:18 66:12

walk 51,17 59:12

walked 49:4 53:6, 9,10,12 58:1 60:10,21,24 61:12

walking 53:21

wanted 14:2 56:3 59:4

warehouse 80:22

watch 35:5,7 59:16

watches 42:23

watching 25 18

weapon 57:8

weather 51:21

week 7:11 18:5 28:4 29:5 32:13,14

west 37:13

white 39:21

window 68:21 69:1

withdraw 22.3 55:24 57:13

words 12:18

work 6:10 8:18,20 9:12 12:16,17 22:5,7 23:24 27.7, 29:11 30:4,7 35:2, 22,24 55:5

worked 12:21 30:19,22 40:7

working 9:7 12:19 32:2 35:5

Reno vs. City of Chicago
Officer Keith Harris - 08/03/2011
Index: works..yelling

works 76:2

write 29:15 73:9, 13 74:10,19 75:20 76:13 77:8 78:24 91 8 98:23

writes 73 10 85:18

writing 75:1 85 12

written 7:7 76:23 77 18 79:8 84:2 99:12,14 102:18

wrong 17 12 43.8 44 11 81 17 101:20

wrote 8:22 75:13 77:7,22 80:6 88.4 89:12 98:9,11,15 100:22 101:8,12

X

Xerox 73.19 80:9

Y

year 23:24 28:5

years 7:22 13:19, 20 30:22

yelling 50:1

